*577 OPINION OF THE COURT
Chief Judge Wachtler.
The integrity of the State government, upon which the public is entitled to rely, requires, at the very least, that the State keep its lawfully enacted promises. When our Legislature grants to contributors property rights in the income of a fund and pledges the "full faith and credit of the State of New York” for the safekeeping of that fund it cannot simply ignore the pledge and abrogate those vested rights.
The plaintiffs in this action are a number of insurance companies engaged in writing property and casualty insurance in this State, trade associations representing the insurance industry, and individuals who hold policies issued by the insurance carriers. They claim an interest in the statutorily created Property and Liability Insurance Security Fund (see, Insurance Law former §§333, 334),[1] to which the plaintiff *578 insurance companies made contributions between 1970 and 1973. Plaintiffs seek, along with related relief, a judgment declaring invalid certain aspects of legislation enacted in 1979 by which the State diverted fund earnings to the State’s general fund (see, L 1979, ch 503, § 4) and legislation enacted in 1982 diverting fund assets to the State’s general fund in exchange for a "dry appropriation” (L 1982, ch 55, §§ 90, 92). The lower courts rejected plaintiffs’ challenge and declared chapters 503 and 55 constitutional.
 We reverse and sustain plaintiffs’ challenge to the extent of declaring invalid those aspects of the challenged legislation that deprived the fund of earnings attributable to contributions made pursuant to section 3 of chapter 189 of the Laws of 1969. The 1969 legislation granted the contributors rights in the income generated by their contributions, which rights, we conclude, attached to all contributions made to the fund while that legislation remained in effect. The State, therefore, may neither appropriate those earnings to itself nor deprive the fund of assets that would generate such income.
We emphasize that our holding is limited to the legislation affecting the Property and Liability Insurance Security Fund. We are aware that the State maintains a number of similar dedicated funds and has increasingly turned to them as a source of revenue. Our decision in the present case turns on the language of the statutes governing this particular fund. The validity of the State’s actions with respect to other funds will depend on the unique set of statutory provisions governing each of the funds affected and is not controlled by our decision here (cf., Methodist Hosp. v State Ins. Fund, 64 NY2d 365 [transfer of assets from the State Insurance Fund to the State’s general fund upheld on the ground that the statutes governing that fund did not create in the policyholders a property interest in the fund’s surplus]).
I. Statutory Background
The Property and Liability Insurance Security Fund had its roots in 1947 legislation which added to the Insurance Law a new section 333 creating the Motor Vehicle Liability Security Fund (L 1947, ch 801). That fund provided for the payment of *579 claims on motor vehicle liability policies in the event of the insurer’s insolvency. Section 333 required every insurer authorized to write motor vehicle liability policies in this State to file quarterly returns stating the amount of net direct written premiums charged on such policies and to make contributions to the fund based on a percentage of such premiums (Insurance Law § 333 [3]). Contributions were to cease when the net value of the fund equaled 15% of the outstanding claim reserves incurred under policies protected by the fund, and would resume only if the net value of the fund dropped below that level due to the payment of claims (§ 333 [4]).
The fund was to consist of "all payments made to the fund by insurers and of securities acquired by and through the use of moneys belonging to the fund, together with interest and accretions earned upon such payments or investments” (§ 333 [2]). Thus, all of the fund’s earnings accrued to the fund. The State Commissioner of Taxation and Finance was established as the custodian of the fund and was authorized to invest the moneys of the fund only in bonds of the United States or New York State (§ 333 [6]).[2]
Finally, section 333 provided that the fund "shall be separate and apart from any other fund and from all other state moneys, and the faith and credit of the state of New York is pledged for their safekeeping” (§ 333 [6]).
By 1969, the section 333 fund had grown to over $125 million. In that year, the Insurance Department recommended expansion of the fund to cover various forms of property and liability insurance other than automobile insurance (see, Insurance Dept Rep, Public Interest Now in Property and Liability Insurance Regulation). Accordingly, the Legislature created the Property and Liability Insurance Security Fund, governed by a new section 334 of the Insurance Law (L 1969, ch 189, § 3). The new fund took over the assets of the section 333 fund and extended its coverage to virtually all kinds of property and liability insurance.
The 1969 law discontinued contributions from motor vehicle insurers, but the earnings on their prior contributions continued to accrue to the fund. Insurers writing policies on the newly covered lines of insurance were required to make *580 contributions based on a percentage of premiums written in those lines until the fund reached a net value of $200 million. Once the $200 million target was reached, no new contributions were to be required unless the fund was depleted by the payment of claims to a net value of less than $150 million (Insurance Law § 334 [3], [4]).
Most significantly for present purposes, the 1969 law provided that income earned on new contributions to the fund would be either returned to the contributors or credited toward future contributions (§ 334 [5]). The expanded fund was otherwise governed by the provisions that had governed the section 333 motor vehicle fund, including the State’s pledge of faith and credit for the fund’s safekeeping and the requirement that the fund be kept separate and apart from other funds and other State moneys (§ 334 [1]).
Pursuant to the 1969 legislation, plaintiff insurance carriers and others writing policies on the newly covered lines made contributions to the fund from 1970 until 1973, when the net value of the fund exceeded $200 million.
For the purposes of assessing the effects of subsequent legislation, including the two acts challenged here, it is important to note that the 1969 legislation created two categories of fund moneys, distinguished by their source and by the treatment given to the income each generated.
First was that portion of the fund attributable to contributions made by motor vehicle insurers between 1947 and 1969 pursuant to section 333 of the Insurance Law — the former Motor Vehicle Liability Insurance Security Fund. As noted above, after 1969 the income generated by these "section 333” moneys continued to accrue to the fund, but no new contributions by motor vehicle insurers were required.[3]
*581 The second category was that portion of the fund attributable to contributions made by nonmotor vehicle insurers between 1970 and 1973 pursuant to section 334 of the Insurance Law, newly enacted in 1969. Income on these "section 334” moneys was returned to the contributors or credited against future contributions.
Prior to the legislation challenged here, one other major change in the fund’s operation occurred. In 1973, after the fund reached its $200 million target, the Legislature amended sections 333 and 334 to provide that the income earned on section 333 moneys (i.e., moneys attributable to contributions by motor vehicle insurers) would no longer accrue to the fund. Instead, after the payment of claims and administrative expenses, such income was to be credited to the State’s general fund (L 1973, ch 861, §§ 10, ll).* **[4] Income on section 334 moneys continued to be returned or credited to the contributors.
It appears from the legislative history of the 1973 amendments that the State’s diversion of fund income was designed to offset partially an anticipated loss of revenue that would accompany significant tax cuts benefiting the insurance industry. The tax reform legislation was actively sought by the insurance industry and was enacted along with the amendments to sections 333 and 334 (see, Rep of Div of Budget on S 6494 [1973], at 5; Mem of State Ins Dept to Governor, June 15, 1973, at 4 [both contained in Governor’s Bill Jacket, L 1973, ch 861]).
The 1973 amendments are not in issue in this case and to *582 our knowledge have never been challenged. We emphasize this, because it requires us to assume the validity of those amendments and, therefore, the State’s entitlement to the earnings attributable to section 333 moneys (after the payment of claims and expenses) as we move to our examination of the 1979 and 1982 legislation that is challenged and as we consider the extent to which the challenged acts may deprive plaintiffs of rights in the fund’s income.
II. The Challenged Legislation
A. The 1979 Legislation
Chapter 503 of the Laws of 1979 is the first target of plaintiffs’ complaint. It is challenged to the extent that it diverts to the State earnings of the fund formerly payable to those who had made contributions pursuant to section 334.
The 1979 legislation amended paragraphs (a), (b) and (c) of section 334 (5). Paragraph (a), which previously allowed a return or credit of income allocable to section 334 contributions, was amended to provide that "with respect to such income earned on or after August first, nineteen hundred seventy-nine no such credit nor [sic] return to such insurer shall be allowed.” Paragraph (b), which had provided for payment of income allocable to section 333 contributions to the State’s general fund, was amended to provide that such income, "together with the earnings referred to in paragraph (a) of this subdivision [i.e., section 334 earnings] * * * shall be credited * * * to the general fund of the state treasury; but only when the value of the fund exceeds the sum of two hundred forty million dollars.” Similarly, paragraph (c) was amended to provide that "any income earned on the moneys of the fund * * * shall be credited to the corpus of such fund until the superintendent determines that the net value of such fund is two hundred forty million dollars, and thereafter shall be credited * * * to the general fund of the state treasury”.[5]
*583 Thus, chapter 503 discontinued the practice of returning or crediting to the contributors the income earned on the section 334 contributions made between 1970 and 1973. Instead, all of the income earned on all fund assets was to be credited to the fund. If, after the payment of claims, administrative expenses and other transfers not in issue here, the net value of the fund exceeded $240 million, the excess was to be credited to the State’s general fund.
B. The 1982 Legislation
Chapter 55 of the Laws of 1982 required the transfer of $87 million of the fund’s corpus to the State’s general fund. Similarly affected by chapter 55 were the Aggregate Trust Fund ($50 million), the State Insurance Fund ($190 million) and the Stock Workmen’s Compensation Security Fund ($67 million) (see, L 1982, ch 55, § 92). In exchange for these transfers, chapter 55 made "dry appropriations” to each of the funds in an amount equal to or greater than the amount transferred (see, L 1982, ch 55, §§ 84, 86, 88, 90).
Thus, with respect to the Property and Liability Insurance Security Fund, section 90 of chapter 55 added a new subdivision (6) to section 334 requiring the Governor to include in each year’s budget bill an appropriation of $90 million, to be encumbered by the State Comptroller and to be paid to the fund if such an appropriation is not made in the following year (see, Insurance Law § 334 [6] [a]). Any such appropriation made to the fund is to be included as an asset for the purposes of computing the net value of the fund (§ 334 [6] [b]).
A new subdivision (7) was also added, providing that the transfer of fund assets to the State’s general fund "is deemed a proper and prudent legal undertaking for any state officer with the responsibility for the custody or the investment of the assets of the fund”. Noticeably absent from the 1982 legislation, however, is any provision for the payment of interest to the fund on the moneys diverted for the State’s use.
*584 III. Plaintiffs’ Challenge
A. Related Litigation
All four transfers mandated by section 92 of chapter 55 were promptly challenged. In Methodist Hosp. v State Ins. Fund (64 NY2d 365, supra), we upheld the transfer of $190 million from the State Insurance Fund, concluding that, because the State alone was liable for the payment of claims upon that fund, because the policyholders had no responsibility to contribute to losses, and because the payment of dividends to policyholders was discretionary, the policyholders had no property or contract rights in the assets or earnings of the fund.
In American Ins. Assn. v Chu (64 NY2d 379), however, we dismissed as premature an action challenging the transfers from the other three funds, including the Property and Liability Insurance Security Fund. In that case, the injury alleged by the plaintiffs was the possibility that, as a result of the transfers and the consequent loss of income to the funds, they would have to replenish the funds with new contributions. We deemed this possibility too speculative to give rise to a justiciable controversy and therefore dismissed the complaint.
By 1988, however, the net value of the Property and Liability Insurance Security Fund had fallen below $150 million, triggering plaintiffs’ obligation to resume contributions to the fund. The justiciability obstacle having thus been eliminated, this action ensued, with plaintiffs adding to their complaint a challenge to the 1979 legislation.
B. The Present Challenge
Plaintiffs’ challenge to the 1979 legislation (ch 503) and the 1982 legislation (ch 55) rests on the premise that they hold a property and/or contract right in the income of the fund. According to their various arguments, the State’s taking of a portion of that income by chapter 503 and its diversion of income-producing assets by chapter 55 constituted a taking of their property without compensation, a deprivation of property without due process and an impairment of the State’s contractual obligations to them, all in violation of familiar State and Federal constitutional guarantees (see, US Const, art I, § 10, cl 1; 5th, 14th Amends; NY Const, art I, § 7).
We need reach only plaintiffs’ claim of a property interest *585 in the fund’s income, for we find that argument dispositive. We are mindful, of course, that the legislation carries a presumption of constitutionality and that the plaintiffs bear the burden of demonstrating beyond a reasonable doubt that it is unconstitutional (see, Cook v City of Binghamton, 48 NY2d 323, 330). This principle requires us to avoid interpreting a statute in a way that would render it unconstitutional if such a construction can be avoided and to uphold the legislation if any uncertainty about its validity exists (see, e.g., People v Liberta, 64 NY2d 152, 171, cert denied 471 US 1020; Matter of Second Report of Nov. 1968 Grand Jury, 26 NY2d 200, 205-206). In this case, however, there is no question of statutory interpretation. The effects of the legislation are obvious and acknowledged. If those effects infringe on constitutionally protected rights, we cannot avoid our obligation to say so.
It is settled that constitutionally protected property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law” (Board of Regents v Roth, 408 US 564, 577; see, Cleveland Bd. of Educ. v Loudermill, 470 US 532, 538; Matter of Economico v Village of Pelham, 50 NY2d 120, 125). There can be little doubt that, while it remained in effect, section 334, as enacted in 1969, gave the contributors a property interest in income attributable to their contributions by providing for its return or credit to them. Had the Superintendent of Insurance failed to make such payments or credits to them, the contributors could have asserted a legitimate "claim of entitlement” (Board of Regents v Roth, supra, at 577) to the moneys, grounded in the statutory guarantee. This is not disputed.
The question presented here is whether the State may extinguish that property right by the simple expedient of repealing the provision which gives rise to it. With respect to future contributions that might be made pursuant to the revised statutory scheme, we have no doubt that the State has such power. But with respect to contributions already made, a different conclusion must be reached.
The State’s power to alter the rights and obligations that attach to completed transactions is not as broad as its power to regulate future transactions. As we recently noted, "[although a statute is not invalid merely because it reaches back to establish the legal significance of events occurring before its *586 enactment, a traditional principle applied in determining the constitutionality of such legislation is that the Legislature is not free to impair vested or property rights” (Matter of Hodes v Axelrod, 70 NY2d 364, 369-370). This doctrine reflects the deeply rooted principles that persons should be able to rely on the law as it exists and plan their conduct accordingly and that the legal rights and obligations that attach to completed transactions should not be disturbed (see, Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv L Rev 692, 692-693).
Thus, where legislation has retroactive effects, judicial review does not end with the inquiry generally applicable to economic regulation, i.e., whether the legislation has a rational basis (see, e.g., Nebbia v New York, 291 US 502, 525). Instead, the courts must balance a number of factors, including " 'fairness to the parties, reliance on pre-existing law, the extent of retroactivity and the nature of the public interest to be served by the law’ ” to determine whether the rights affected are subject to alteration by the Legislature (Matter of Hodes v Axelrod, supra, at 370; Matter of Chrysler Props. v Morris, 23 NY2d 515, 518). Relevant to these considerations in the present context are the nature of the obligations explicitly undertaken by the State with respect to the fund and the reasonable expectations of the contributors created by the statutory scheme pursuant to which they made their contributions.
Balancing these factors, we conclude that the contributors’ right to the income attributable to the contributions made while the law granting those rights was in effect may not be extinguished by the State.
Despite the dissent’s protestations, there is nothing novel, unfocused or frightening about the predicate for our holding. Let there be no mistake, our decision rests on the constitutionally based protection against legislative interference with vested rights, a doctrine with a long tradition (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 51 [and 1991 Cum Ann Pocket Part] [and all cases cited therein]). Nor is our decision a throwback to the discredited Lochner era (see, Lochner v New York, 198 US 45) as the dissent suggests (dissenting opn, point II). We are not substituting our judgment for that of the Legislature as to the wisdom of its actions. We are simply giving meaning to the words used by the Legislature. The dissent, on the other hand, never explains how its approach *587 gives any substance to the State’s pledge of "full faith and credit,” for example.
Even the State concedes (and the dissent apparently agrees [dissenting opn, at 600-601]) that a statutory scheme like that in issue here may establish such immutable rights. The Attorney-General points to the statute governing the Life Insurance Guaranty Fund (now codified in Insurance Law § 7504) as an example of such a statute. The Life Insurance Guaranty Fund is funded by mandatory contributions from life insurance companies and exists to pay the claims of persons holding life insurance policies issued by insurers that have become insolvent. The statute provides that the income from the fund "shall belong, and be refunded, to the contributors in proportion to the amounts contributed by them,” that the certificates acknowledging their contributions can be carried as "admitted assets” of the contributors, and that the contributors have a reversionary interest in the fund in the event of its dissolution.
These provisions, the State concedes, grant to the contributors rights in the fund which cannot be revoked. Thus, while the State and the dissent seek to distinguish the statutes in issue here, they do not dispute the principle we apply — that such statutory provisions may create rights that cannot be extinguished by the State. The only dispute is whether the statutes governing the Property and Liability Insurance Security Fund created such rights. We conclude that they did.
As noted, when the insurance company plaintiffs and other carriers made contributions to the fund pursuant to section 334, the law then in effect explicitly granted them the right to the income earned on those contributions. In addition, the law provided a number of assurances that their contributions would be used only for the benefit of the fund and not as the State might otherwise provide in the future. For example, the State pledged its faith and credit for the fund’s safekeeping and promised to keep the fund separate and apart from other State moneys (Insurance Law § 333 [6]). At a minimum, these provisions obligated the State to act in good faith with respect to, the fund and its contributors and to ensure that the fund’s assets and earnings would be available for their intended purposes (cf., Flushing Natl. Bank v Municipal Assistance Corp., 40 NY2d 731, 735-736).
Similarly, the Commissioner of Taxation and Finance was established as "custodian” of the fund (Insurance Law § 333 *588 [6]), a term that implies "responsibility for the protection and preservation of the thing in custody” (Black’s Law Dictionary 384 [6th ed] [custody]). The Commissioner’s control (and hence the State’s control) of the fund was and remains strictly circumscribed. Investments of the fund’s assets have always been limited by statute to a very few, specifically enumerated, income-producing types: government obligations, government-secured certificates of deposit, obligations of public benefit corporations and, only to the extent of one third of the fund’s assets, mortgage loans or deeds of trust (Insurance Law § 333 [6]). Expenditures of the fund’s assets are similarly circumscribed. Payments are authorized only for allowed claims (Insurance Law § 333 [7]) and for those administrative expenses authorized by the Director of the Budget (Insurance Law § 333 [9]).
Finally, the statuté provided assurance that, once the fund reached its $200 million goal, the contributors would not be required to resume payments unless the fund’s value was reduced below $150 million by the payment of claims (Insurance Law § 334 [4]). The law did not contemplate that the State could draw on the fund for other purposes.
All of these limitations established by the Legislature dictate that the contributions made by plaintiffs were not to become State moneys to do with as it wished. Instead, the statutory scheme, viewed as a whole, created in the State obligations to preserve the fund and to use its assets and earnings only for the narrow purposes set forth.
Chapters 503 and 55 have retroactive effects to the extent that they purport to relieve the State of those obligations. The State changed the conditions affecting contributions already made, eliminating the contributors’ right to the income on their contributions and "investing” a sizable portion of the fund’s assets, not in the income-producing options authorized at the time the contributions were made, but in an interest-free loan to itself. In addition, the State’s actions depleted the fund by depriving it of income that otherwise would have been available to pay claims and, ultimately, required the contributors to replenish the fund. In effect, therefore, the State has simply used the contributor’s obligation to replenish the fund as a means of raising revenues for the State’s general purposes.
The only justification the State can offer for the breach of its commitment is the enhancement of the State’s general *589 revenues. It is self-evident that this cannot justify the State’s actions; the State’s commitment to preserve the fund would be meaningless if it could be overcome by its desire to use the funds for other purposes.
 We conclude, therefore, that chapters 503 and 55 are invalid to the extent that they deprive the Property and Liability Insurance Security Fund of income on contributions made by insurers pursuant to the 1969 legislation, i.e., the section 334 contributions. We emphasize that our conclusion is based on the fact that the challenged legislation purports to eliminate the plaintiffs’ rights with respect to contributions already made. Nothing in our decision prevents the State from changing the law as it affects future contributions. Nor does our decision preclude the State from making adjustments in the administration of the fund, as it has done in the past by adding categories of permissible fund investments, as long as such changes are consistent with the State’s obligations to preserve the fund and do not unreasonably impair the contributors’ rights in the income allocable to section 334 contributions.
Finally, we note that the case is readily distinguishable from Methodist Hosp. v State Ins. Fund (64 NY2d 365, supra). The statute in issue in that case provided that the payment of dividends was discretionary. Thus, in contrast to the present case, the statute granted no legitimate entitlement to that income and hence no property interest. In Methodist Hosp., therefore, the transfer of moneys from the fund and the consequent loss of income did not upset any rights or obligations that had attached to completed transactions.
Furthermore, the statutes governing the State Insurance Fund provide that the State, and only the State, is responsible for the payment of awards from that fund. The employers who pay premiums for coverage by that fund are under no obligation to contribute to fund losses (Methodist Hosp. v State Ins. Fund, supra, at 377). Thus, the loss of income occasioned by the transfer of State Insurance Fund assets to the State’s general fund deprived the State of assets from which to pay its own obligations and did not trigger resumed contributions from the employers. Here, in contrast, depletion of the fund requires the contributors to make further contributions.
This distinction points up the significance of the State’s pledge of "full faith and credit” for the safekeeping of the Property and Liability Insurance Security Fund, a pledge that *590 was not made with respect to the State Insurance Fund. By that pledge, the State obligated itself to maintain the integrity of the fund in order to protect the contributors from having to replenish the fund unnecessarily and to ensure the availability of funds for the payment of claims.
IV. The Remedy
As it concerns chapter 503, our holding requires the State to reimburse the fund for any income attributable to section 334 contributions that was paid to the State’s general fund and requires the fund to return or credit these amounts to the contributors as provided by section 334 (5) prior to the enactment of chapter 503. To accomplish this, an accounting will be necessary. Plaintiffs allege that pursuant to chapter 503, $37 million of the fund’s earnings were credited to the general fund. The State admits to the $37 million figure, but does not admit that all of this amount was transferred pursuant to chapter 503. Instead, the State asserts only that this amount was transferred pursuant to unspecified statutory authority. It is therefore unclear from the present record how much of this amount represents income on section 334 contributions and how much represents earnings attributable to section 333 contributions that were properly payable to the State pursuant to the unchallenged 1973 amendments.
The reimbursement should include interest on the amounts wrongfully diverted by the State. The parties have not addressed whether the measure of interest should be the statutory rate, whether it should match the performance of the fund during the years the diverted moneys have been unavailable to the fund, or whether some other measure should apply. Accordingly, we leave that issue to be litigated in the proceedings to follow.
With respect to chapter 55, which transferred $87 million of the fund’s corpus to the State’s general fund, it should be noted that the “dry appropriation” required by that legislation is included as a fund asset in determining the fund’s “net value” (Insurance Law § 334 [6] [b], as amended by L 1982, ch 55, § 90) and that the obligation of the insurance companies to resume contributions is tied to the fund’s net value (§ 334 [4]). Thus, the transfer did not directly reduce the fund’s value for purposes of determining whether contributions should resume and therefore did not, by itself, cause any harm to plaintiffs. Plaintiffs were harmed, however, by the loss of income that *591 could have been generated by such moneys had they remained in the fund. It is not clear on this record whether this income would have prevented the fund’s value from dropping below the level at which new contributions were required, but its loss undoubtedly contributed to the fund’s diminution.
We conclude, therefore, that the State must account to the fund for the lost income and, until the moneys are returned to the fund, must continue to pay interest on the amount transferred at a rate equivalent to that which could be earned by the fund if those moneys were invested as authorized by section 333 (6). As long as those moneys are generating a reasonable level of income for the fund, and as long as they are made available for the fund’s purposes if that should become necessary, their use by the State does not offend the contributors’ rights or breach the State’s obligations. Thus, we see no need to order their immediate return.
Plaintiffs also seek a refund of those contributions they were required to make after the fund’s value fell below $150 million in 1988. They are entitled to such relief only if and to the extent that those contributions would not have been required but for the invalid aspects of chapters 503 and 55. This, too, must await the outcome of an accounting.
Finally, we note that the effect of our holding with respect to chapter 503 is to restore the statutory scheme governing the distribution of the fund’s income that was in effect prior to that legislation. This not only restores plaintiffs’ rights in the income allocable to section 334 contributions, but it also eliminates the provision requiring the fund’s balance to exceed $240 million before distribution of any of the fund’s earnings to the State. It revives the scheme put in place by the 1973 amendments, including the State’s right to all earnings attributable to section 333 contributions, less amounts paid for allowed claims and administrative expenses (see, Insurance Law § 334 [5], as amended by L 1973, ch 861).
Thus, against the reimbursement which the State is required to make to the fund, the State should be allowed an offset of any amounts of section 333 earnings that were payable to the State pursuant to the 1973 legislation, but which were not paid due to limitations imposed by chapter 503. In addition, to the extent that the $87 million transferred pursuant to chapter 55 represents section 333 moneys, the State’s payment of interest on those moneys pursuant to this decision must be considered section 333 earnings and must be *592 included in determining what amounts were payable to the State pursuant to the 1973 legislation and which are, therefore, to be included in the offset.
Accordingly, the order of the Appellate Division should be reversed, with costs; plaintiffs’ motion for summary judgment granted; section 4 of chapter 503 of the Laws of 1979 declared invalid except to the extent that it authorizes payments of earnings of the Property and Liability Insurance Security Fund (now known as the Property/Casualty Insurance Security Fund) to offset deficits of the New York Property Insurance Underwriting Association; sections 90 and 92 (4) of chapter 55 of the Laws of 1982 declared invalid to the extent that they deprive the Property and Liability Insurance Security Fund of income on the assets of such fund thereby directed to be transferred to the State’s general fund; and the case remitted to Supreme Court, Albany County, for further proceedings in accordance with this opinion.

. In 1984, the Insurance Law was recodified without substantive change (L 1984, chs 367, 805). Pursuant to the recodification, the Property and Liability Insurance Security Fund is now known as the Property/Casualty Insurance Security Fund and is governed by article 76 of the Insurance *578 Law. Inasmuch as the events relevant to this appeal occurred before the recodification, repeated reference to the former Insurance Law and its terminology is necessary. Throughout this opinion, therefore, statutory references will be to the former Insurance Law unless otherwise noted.

. Section 333 (6) was later amended to allow investments in certain secured certificates of deposit (L 1964, ch 395, § 2), mortgage loans or deeds of trust (L 1970, ch 611, § 1) and obligations of public benefit corporations (L 1971, ch 679).

. Contributions from motor vehicle insurers were discontinued in recognition of the fact that their prior contributions were responsible for the sizable balance taken over by the new fund — more than $125 million at the time the fund’s expansion was proposed. The Insurance Department calculated that a fund of $150 million would be adequate for the fund’s expanded purposes, but suggested that the new contributors be required to bring the fund up to $200 million to achieve a measure of equity between the two groups of contributors (see, Insurance Dept Rep, Public Interest Now in Property and Liability Insurance Regulation, at 62).
Once the initial $200 million target was reached, contributions were to resume only if claims on the fund reduced it to below $150 million. In such an event, the resumed contributions were to be apportioned ratably among those kinds of insurance that had been responsible for claims upon the fund *581 during the preceding year (Insurance Law former § 334 [4]). Thus, it appears that motor vehicle insurers might be required to resume contributions if claims upon motor vehicle policies were responsible for depletion of the fund.

. Specifically, section 333 (2) was amended as follows to exclude from the definition of the fund’s composition income earned after the effective date of the amendment:
"Such fund shall consist of all payments made to the fund by insurers and of securities acquired by and through the use of moneys belonging to the fund, together with interest and accretions earned upon such payments or investments earned prior to January first, nineteen hundred seventy four. ”
In addition, section 334 (5) was amended by adding the following language after the provision requiring income on section 334 moneys to be returned or credited to the contributors:
"all other income so earned on other moneys in the fund (after deducting any amounts paid for allowed claims and administrative expenses during the preceding year) shall be credited * * * to the general fund of the state treasury.”

. The amendment to paragraphs (b) and (c) also provided that up to $15 million per year of such earnings were first to be credited against the deficit, if any, from the operations of the New York Property Insurance Underwriting Association, a statutorily created joint underwriting association providing fire and extended coverage insurance to homeowners and businesses in distressed urban areas where such coverage is not available on the voluntary market. Only fund earnings in excess of the amount used for such purposes were to be credited to the fund and ultimately, if the fund *583 exceeded $240 million, to the State’s general fund. The payments to the underwriting association are not challenged in this litigation. Although no provision for repayment of these moneys was included in the 1979 legislation, repayment was mandated by subsequent legislation (L 1982, ch 55, § 91) and the amounts transferred were repaid with interest.