**WORKERS' COMPENSATION**

**INJURED WORKERS' INSURANCE FUND – WHETHER THE STATE HAS AN INTEREST IN THE RESERVES, SURPLUS, AND OTHER ASSETS OF THE INJURED WORKERS' INSURANCE FUND**

March 14, 2011

*Thomas Phelan*
*CEO/President*
*Injured Workers Insurance Fund*

You have asked for our opinion on two questions concerning the Injured Workers' Insurance Fund ("IWIF"). Specifically, you ask:

1. Who owns IWIF's reserves and surplus?

2. Does the State have any claim to IWIF's reserves, surplus, or other assets?

For the reasons set forth below, it is our opinion that:

1. The reserves and surplus that the Insurance Article requires IWIF to maintain with respect to its policies are held in trust for the employers who are IWIF's policyholders and the employees who are entitled to benefits under IWIF's policies. If the General Assembly chose to terminate IWIF's existence, it would need to make arrangements to preserve such funds for those purposes.

2. To the extent that IWIF has assets in excess of the reserves and surplus required by the Insurance Article, upon IWIF's termination, those assets would belong to the State, which created IWIF. The statute governing IWIF provides for the General Assembly to direct the disposition of those assets or for the assets to be distributed "as justice requires."

**I**

**Background**

*A.  State Workers' Compensation System*

Like the laws of other states, Maryland law requires employers to have workers' compensation insurance to compensate employees

3

for workplace injuries. Annotated Code of Maryland, Labor & Employment Article ("LE"), §9-402. Many employers purchase workers' compensation insurance from insurers, while other employers self-insure. The Workers' Compensation Commission adjudicates employees' entitlement to benefits and oversees the workers' compensation system. As part of that system, the Legislature has created several entities to ensure that employers can obtain the necessary insurance and that benefits are paid even when employers fail to arrange for insurance.[1]

### B. IWIF – the Agency

IWIF was created by statute to provide insurance for employers who would otherwise be unable to obtain coverage. *See* R. P. Gilbert & R. L. Humphreys, *Maryland Workers' Compensation Handbook* (3d ed. 2007) at pp. 2-18. Since its inception, IWIF has been an agency or instrumentality of the State. *Central Collection Unit v. DLD Assoc. Limited Partnership*, 112 Md. App. 502, 510, 685 A.2d 873 (1996). It was established in 1914 as part of the State Industrial Accident Commission, a predecessor to the Workers' Compensation Commission.[2] Chapter 800, §16, Laws of Maryland 1914. It was made a separate agency in 1941, later incorporated into the Department of Personnel, and still later made an independent agency. *See* Chapters 584, 585, Laws of Maryland 1987; Chapter 98, Laws of Maryland 1970; Chapter 504, Laws of Maryland 1941.

IWIF is governed by a board, which is appointed by the Governor with the advice and consent of the Senate. LE §10-110. Although the Legislature has exempted IWIF generally from laws affecting State agencies, it has explicitly made the agency and its employees subject to specified laws governing State agencies and employees. *See* LE §10-107(b). Among those laws are the Public Information Act, the Public Ethics Law, and the State whistleblower law. *Id*.

---

[1] In addition to the Workers' Compensation Commission and IWIF, the Legislature has established the Uninsured Employers' Fund, which provides benefits to employees whose employers have failed to obtain insurance, and the Subsequent Injury Fund, which provides additional benefits to injured workers with pre-existing health conditions. LE §9-801 *et seq.*; LE §9-1001 *et seq.*

[2] IWIF was originally known as the State Accident Fund. It was renamed in 1990. Chapter 71, Laws of Maryland 1990.

IWIF's operations are limited to the realm of workers' compensation insurance. LE §10-106(b)(4). IWIF is to function in a manner similar to a private workers' compensation insurer. LE §10-106(a). While it is to operate as a competitive insurer in the marketplace, it must also guarantee the availability of workers' compensation insurance in Maryland and serve as the insurer of last resort. LE §10-106(b)(1)-(3). In addition to providing insurance, IWIF administers claims for certain employers who choose to self-insure. *See* LE §10-105(b). As a workers' compensation insurer, IWIF is subject to oversight by the Workers' Compensation Commission. *See* LE §9-309(e) (approval of policy forms); LE §9-316(a)(3), (c) (Commission assessment). IWIF is also a member of Property and Casualty Insurance Guaranty Corporation, a State-created entity that backstops claims against insurers that become insolvent. LE §10-107(c); *see also* Annotated Code of Maryland, Insurance Article, §9-301 *et seq.*

IWIF is also subject to regulation by the Maryland Insurance Administration ("MIA") in much the same manner as a private workers' compensation insurer. LE §10-105(a). It is exempted from provisions specifically directed to stock and mutual insurers, the premium tax, and insurance rate making. *Id*. It is subject to examination by the MIA, which must determine, at least once every five years, whether IWIF's rates are actuarially sound. LE §10-125. IWIF is also to file a report each year with the Governor about its operations, its financial condition, and market trends. LE §10-126(a). In addition, on an annual basis, it is to provide the Governor with a copy of each policy form it uses, a schedule of its rates, its provisions for payment of claims, and other information, all in a format similar to that used by insurance rating organizations. LE §10-126(b).

## C. IWIF - the Fund

The agency administers a fund that finances the insurance coverage it was created to provide. LE §10-117 *et seq*. The statute governing IWIF refers to "the Fund" to mean both the agency and the moneys that the agency oversees. For purposes of this opinion, we will use the term "IWIF" to refer to the agency and the term "Fund" to refer to the moneys that the agency administers.

The Fund consists of premiums received for insurance policies, income from invested funds, interest from deposited funds, and proceeds of any debt collections. LE §10-118(a). IWIF is to use

these moneys to pay the expenses of the agency and any losses incurred on its policies. LE §10-118(c). It is to keep reserves and surplus in accordance with the Insurance Article. LE §10-121. The statute provides that, if IWIF's enabling legislation is repealed, the moneys that are in the Fund are to be distributed as directed by the General Assembly or, failing specific direction, "as justice requires, with due regard for existing obligations for compensation." LE §10-127.

## II

## Analysis

You first ask who owns IWIF's reserves and surplus. Secondly, you ask whether the State has any claim to IWIF's reserves, surplus, or assets. From these questions – and the discussion in your letter – we gather that your concern is the ultimate disposition of IWIF's assets, should IWIF cease to exist, either in its current form or altogether. Because a change in the form of IWIF could raise a host of issues that may or may not affect our answer, we will focus on a scenario where IWIF's existence is simply terminated.

### A.  Disposition of the Fund upon IWIF's Termination

IWIF's enabling law provides that, if it should be repealed, the moneys in the Fund are to be distributed "as the General Assembly provides" or, failing such direction, "as justice requires, with due regard for existing obligations for compensation." LE §10-127. Thus, the Fund would not automatically revert to the State's general fund. Indeed, such a reversion might well be challenged as a unconstituional impairment of the insurance contracts between IWIF and its policyholders. *See Allstate Insurance Co. v. Kim*, 376 Md. 276, 298-300, 829 A.2d 611 (2003) (discussing whether legislation substantially impaired insurance contract).

On the other hand, the Fund is not simply the property of the current policyholders. IWIF was not created as a mutual insurance company. Nor is there any indication in its enabling law that its assets belong to its current policyholders. If the Fund simply belonged to current policyholders, there would be no need for the General Assembly's direction on how to distribute its funds upon termination. Moreover, the statute explicitly contemplates the possibility that there may be assets to be distributed even after there

has been "due regard for existing obligations for compensation." This provision has been part of IWIF's enabling law since its inception. *See* Chapter 800, §28, Laws of Maryland 1914. This indicates that it has always been the intention of the General Assembly to retain authority over the disposition of any residual of the Fund.

What part of the Fund is devoted to "existing obligations for compensation," and what part is subject to other dispositions? Part of the Fund that consists of the statutorily-mandated reserves and surplus required to service IWIF's liabilities and existing policies. If IWIF were to cease operations, that part of the Fund would presumably fulfill IWIF's "existing obligations" under current and past insurance contracts. Any moneys in the Fund in excess of the required reserves and surplus would belong to the State, as the "owner" of IWIF.[3] There would not appear to be a basis for any other disposition. For example, payment of excess funds that derived from prior operations to current policyholders would simply be a windfall to current policyholders without any apparent economic or legal basis.[4] If the Fund lacked sufficient funds to satisfy IWIF's required reserves and surplus, there would be no excess assets for the State to distribute.

### B. *1968 Attorney General Opinion*

More than 40 years ago, Attorney General Burch was asked whether the Legislature could make the Fund part of the State's general fund. He was also asked whether the State would be liable

---

[3] The principle that the State may control the disposition of assets in excess of the required reserves and surplus applies even without the dissolution of IWIF. The circumstances under which the State would do so, and the mechanics by which the extent of excess assets would be determined are beyond the scope of this opinion.

[4] It is notable that a federal tax exemption for entities such as IWIF contemplates, as a condition of the exemption, that assets of those organizations revert to the state upon dissolution of the entity. *See* 26 U.S.C. §501(c)(27)(B)(iii)(II); Aprill, *The Integral, Essential, and the Instrumental: Federal Income Tax Treatment of Governmental Affiliates*, 23 J. Corp. L. 803, 833 (1998).

for claims against IWIF[5] if the Fund were insolvent. The resulting opinion concluded, correctly in our view, that (1) the Legislature could not "take over the moneys [of the Fund] and apply them to general State purposes" and (2) the State was not liable for claims against IWIF. 53 *Opinions of the Attorney General* 3, 12 (1968) ("1968 Opinion"). However, some of the language of that opinion was more expansive than necessary and could be read to espouse what is, in our view, an unwarranted assignment of the entire Fund to current policyholders. We explain.

In concluding that the Fund could not be merged into the State's general fund, the 1968 Opinion observed that the moneys in the Fund derived from premiums paid by employers for insurance. 1968 Opinion at 4. Part of that sum would be used to pay current claims by injured employees. The remainder would be used for reserves and surplus. The opinion noted that IWIF was required by statute to set up a reserve sufficient to meet anticipated losses and "carry all claims and policies to maturity" and to maintain a surplus "sufficiently large to cover the catastrophe hazard." *Id*. at 5 (quoting Article 101, §78). Those statutory requirements have been modified in the intervening years, but IWIF's basic obligation to maintain a sufficient balance in the Fund to cover anticipated claims remains in the law.[6]

The 1968 Opinion observed that the Fund, as well as similar funds in other states, had been created for the benefit of employers and employees, and not for the benefit of the State. 1968 Opinion at 5. It noted that "if the Legislature were to appropriate the assets of [IWIF] and use them for general State purposes, employers would be deprived of the protection of adequate reserves to guard against claims of injured employees." *Id.* at 5-6. The opinion appeared to be focused on the validity of the State "taking over the reserves and surplus of the ... Fund." *Id*. at 9; *see also id*. at 11. Indeed, it posited a situation in which the distribution of Fund assets would mean that

---

[5] At the time of the opinion, the agency was still known as the State Accident Fund. To avoid confusion, we use its current name in this opinion.

[6] During the past decade, after the relevant provision was recodified as LE §10-121, the specific reserves and surplus requirements in IWIF's enabling law were eliminated, and the agency was made subject to the same requirements that apply to other insurers. *See* Chapter 336, Laws of Maryland 2009.

there would not be "adequate reserves to cover incurred liabilities." *Id*. at 11.

The diversion of the necessary reserves and surplus from the Fund to other uses obviously would undermine its purpose and might well impair the contracts between IWIF and its policyholders.[7] However, the 1968 Opinion summarized its analysis by stating that "the assets [of IWIF] *belong exclusively* to the policyholders ..." *Id*. at 3 (emphasis added). The use of the words "belong exclusively," which might suggest that current policyholders had a property interest in the entirety of the Fund and that no portion of the Fund could ever be devoted to anything other than the payment of claims or dividends, went beyond the reasoning of the opinion. In particular, the 1968 Opinion did not consider the possibility that the Fund might contain funds in excess of those needed to pay current claims and to satisfy the statutorily required reserves and surplus. Nor did it discuss the possibility that only a portion of the Fund, as opposed to the entire Fund, might be directed to general State purposes.

Similarly, the 1968 Opinion stated that the Fund was "in effect a trust fund which belongs to employers..." *Id*. at 11.[8] It is true that, in creating IWIF, the State pledged the Fund, including the amounts needed for current claims and the statutorily described reserves and surplus, for the benefit of the policyholders. The statute limited the

---

[7] The 1968 Opinion did not itself analyze the impairment of contract issue. For a discussion of a state government's obligation not to impair its own contracts, *see* 90 *Opinions of the Attorney General* 195, 207-9 (2005). The issue has been discussed in the context of state-created workers' compensation insurers in numerous cases in other states. *See* Part II.B of this opinion.

[8] The 1968 Opinion supported its conclusion that IWIF held the Fund "in trust" for policyholders and employees with a survey of similar laws in many other states. 53 *Opinions of the Attorney General* at 6-9. However, as will be seen in the next section of this opinion, courts in a number of those states have concluded that funds similar to the Fund do *not* belong exclusively to the policyholders served by those funds.

State's liability to the amount of the Fund and did not permit any recourse to other State funds.[9] Thus, the current liabilities, reserve, and surplus could properly be considered to be held in trust for the policyholders and their employees. However, that does not mean that all assets of IWIF are held in trust for, or owned by, the policyholders and that the General Assembly is helpless to devise some other disposition of any excess assets. Indeed, the General Assembly reserved the power to distribute funds remaining after "due regard" for existing obligations.

Thus, we agree with the essential conclusions of the 1968 Opinion that the Legislature may not merge the reserves and surplus of the Fund into the State's general fund and that the State is not liable for claims against the Fund. To the extent that some language of the 1968 Opinion could be read to adopt a more expansive view of current policyholders' interest in the Fund and a more restrictive view of the State's interest, we overrule that opinion.

### C. Cases Involving State-Created Workers' Compensation Insurers in Other States

Questions concerning the disposition of assets of state-sponsored workers' compensation insurers have been addressed by courts in other jurisdictions. While none of those insurers is identical to IWIF[10], and the courts have reached varying results, the cases make clear that a state may retain some interest in the assets of a state-created workers compensation insurer.

The highest appellate courts in several states with state-sponsored workers' compensation insurers similar to IWIF have rejected claims that policyholders have a property interest in the funds administered by those insurers. On the other hand, several courts in other states have held that the state had no interest in funds

---

[9] This has been the case since the creation of the Fund. *See* Chapter 800, §16, Laws of Maryland 1914 ("Such fund shall be administered by the Commission without liability on the part of the State or the custodian thereof beyond the amount of such fund and shall be applicable to the payment of losses sustained on account of insurance and to the payment of expenses in the manner provided in this Act.").

[10] The variety of such entities poses a particular challenge to authors of legal encyclopedias who attempt a general description. *See* 100 CJS *Workers' Compensation* §647 ("Nature of fund").

administered by a state-sponsored workers' compensation insurer and overturned efforts to transfer moneys from those funds to a state general fund. However, the latter holdings appear to be based on specific provisions of the enabling statutes not found in the Maryland statute or on a finding that all of the moneys in the fund were needed to fulfill the obligations of the fund.

*Sale or Liquidation of State-Created Insurer*

In a case involving privatization of a state-created insurer, the Michigan Supreme Court was asked to determine the constitutionality of legislation authorizing the sale of the State Accident Fund ("SAF") – the Michigan analog to IWIF. *In re Certified Question: Fun 'n Sun RV, Inc. v. Michigan*, 527 N.W.2d 468 (Mich. 1994). That legislation authorized the sale of the assets of SAF, together with the transfer of its liabilities, with the proviso that most of the consideration for the transaction would go to the state treasury. Policyholders asserted that they were entitled to a distribution of any profit from the transaction. They argued that the direction of the profits to the state treasury was unconstitutional as an impairment of contract and a deprivation of property without compensation. *Id*. at 473.

The Michigan Supreme Court acknowledged that, in prior unrelated cases, a federal court and an intermediate state appellate court had held that SAF's assets were held in trust for its policyholders and could not be used by the state for general purposes. *Id.* at 472. However, by the time of the *Fun 'n Sun RV* case, the structure of SAF had been fundamentally changed by the legislature. In particular, it had been made independent of any state department and various changes had been made in its statute to put it on "an equal footing with private insurers in the marketplace and ensure that it did not compete unfairly with them." *Id*. at 473.

In the end, the Michigan Supreme Court found no merit in either constitutional claim. First, it concluded that the relevant statutes did not give the policyholders a contractual right to SAF's excess assets. Rather, they had a vested contractual right to liability coverage for the period for which they had paid premiums. There had been no showing that those contractual rights would be impaired

by the sale. *Id*. at 473-78.[11]  Second, it held that the federal court's statement that the assets of SAF were held "in trust" for policyholders did not mean that those assets were the property of the policyholders.  The Michigan court explained:

> We note that the "trust" language then employed by the Court did not speak in terms of an ownership interest on the part of the policyholders.  Indeed, the Court did not expressly identify any beneficiary of the "trust" to which it referred.
>
> We are convinced that the Court of Appeals used the words "in trust" in an informal, descriptive sense, rather than as declaration of a formal trust relationship....  The better inference is that the Court of Appeals used the words "in trust" in the sense that the state's receipt of the policyholders' premiums resulted in an obligation to manage those premiums to assure the intended benefit, insurance coverage.

*Id*. at 479.  The court contrasted SAF to a mutual insurance company, in which a policyholder would have a property interest in the surplus of the company.  *Id*. at 480.  In the absence of such a property interest, there could be no taking in violation of due process.  *Id*. at 480-82.

In *Moran v. State*, 534 P.2d 1282 (1975), the Oklahoma Supreme Court reached a different conclusion in a case involving a partial liquidation of the state-created workers compensation insurer when there was no surplus in the fund.  In that case, the legislature directed the partial liquidation of the fund of the insurer for appropriation by the legislature. Upon a constitutional challenge by policyholders, the court held that, because the funds were not "state funds," but rather funds held in trust for insured employers and their employees, they were not subject to appropriation by the legislature. This conclusion was based, in part, on a finding that there were "no

---

[11] The court distinguished an Oregon case in which the state had explicitly disclaimed any state proprietary interest in a workers' compensation fund.  *See Eckles v. State*, 760 P.2d 846 (1988), described later in the text.

excess surplus funds" in the fund and that policyholders would be obligated to make up any shortfall. 534 P.2d at 1285-88.

*Transfers of Funds from State-Created Insurer*

In the early 1980s, the New York legislature passed a law that transferred $190 million from the State Insurance Fund ("SIF"), a fund that existed to insure employers with respect to workers' compensation claims, to the state's general fund. *See Methodist Hospital of Brooklyn v. State Insurance Fund*, 476 N.E.2d 304 (N.Y. 1985). The same law provided for an appropriation of the same amount back to SIF for the purpose of maintaining its solvency if deemed necessary by the state's budget director. 476 N.E.2d at 306-7. Two employers insured by SIF sought to overturn the law, alleging that it was unconstitutional for a variety of reasons.

The New York Court of Appeals rejected the notion that SIF was essentially a mutual insurance pool such that its policyholders had a property interest in it. While SIF was required to make reports to the state insurance commissioner similar to those made by mutual insurance companies, its policyholders were not members and had no say in its governance. *Id*. at 308. Nor did they have any responsibility to contribute to make up its losses. Like IWIF, SIF was a state agency. *Id*. at 309. Unlike the situation with IWIF, the state faced potential liability if SIF were insufficient to satisfy claims.[12] The New York court concluded that the policyholders had no property interest in the surplus amount of that fund, unless SIF exercised its discretion to declare a dividend to policyholders. *Id*. at 310. Accordingly, the transfer of a portion of the surplus to the state's general fund did not violate state or federal law. *Id*.[13]

---

[12] A state's exposure to liability should not be a determining factor as to its ownership interest in a state-created workers compensation insurer, according to the Michigan Supreme Court. In the *Sun 'n Fun RV* case, it rejected an argument that a state that has limited its exposure would thereby lose its ownership interest. 527 N.W.2d at 785 n. 21.

[13] The New York Court of Appeals reached a somewhat different result in a subsequent case concerning a transfer from New York's Property and Liability Insurance Security Fund – a fund perhaps analogous to Maryland's Property and Casualty Insurance Guaranty Corporation – to the New York general fund. *Alliance of American Insurers v. Chu*, 571 N.E.2d 672 (1991). The court held that the transfer was unconstitutional

(continued...)

A different conclusion was reached when the state legislature explicitly disclaimed any interest in the fund. In *Eckles v. State* 760 P.2d 846 (Or. 1988), the Oregon Supreme Court held that a transfer of funds from a state-created workers' compensation insurer to the state's general fund breached the state's contract with employers and violated the state constitution. State law had specifically provided that the fund was a trust fund "exclusively for the uses and purposes of" the workers' compensation law, that the state had "no proprietary interest" in the fund, and that it had waived any right to reclaim its own initial contributions to the fund. 760 P.2d at 852. In tracing the origin of the key statutory provisions, the court demonstrated that they were a reaction to an earlier instance in which money had been transferred out of the fund for other governmental purposes. The court concluded that the statutory provisions disclaiming any state interest in the fund amounted to a contractual promise to induce employers to obtain insurance from the fund. *Id*. at 855. It held that the subsequent amendment allowing a transfer of money from the fund for general government use impaired existing insurance contracts, although the amendment would be valid as to subsequent contracts and contract renewals. *Id*. at 858.[14]

---

[13] (...continued)
because the insurers that had contributed to the fund had a property right in the earnings of the fund. The court distinguished *Methodist Hospital* on the grounds that the payment of dividends to policyholders by SIF was discretionary, that SIF's policyholders had no obligation to make contributions to offset losses of the fund, and that the state had not pledged its full faith and credit in the case of SIF. 571 N.E. 2d at 680-81. Each of those factors also distinguishes the Fund managed by IWIF.

[14] In Colorado, the state's Solicitor General looked to similar provisions in Colorado law in concluding that moneys of a state sponsored workers' compensation insurer could not be used for general state purposes. *See* <www.coloradoattorneygeneral.gov/sites/default/files/press_releases/2009/04/10/.pdf> (noting that state law provided that the state-sponsored workers' compensation insurer was to "operate as a domestic mutual insurance company," that its board was to have the powers, rights, and duties of the board of a mutual insurance company, that all revenues, moneys, and assets of the insurer belonged "solely" to the insurer, and that the state had "no claim to, nor any interest in" those revenues, moneys, and assets).

*General Question of Ownership of Funds of State-Created Insurer*

In a variety of circumstances, courts in other states have held that policyholders do not have a property interest in a state-created workers' compensation fund, unless the law creating the fund clearly dedicated the entirety of the fund to the policyholders. In *Kelso & Irwin, P.A. v. State Insurance Fund*, 997 P.2d 591, 596-97 (Id. 2000), the Idaho Supreme Court held that policyholders had no ownership interest by statute or by contract in a state-created worker's compensation insurer and therefore could not compel the insurer to issue a dividend to them. Rather, the court held that, because assets of the fund belonged to the fund for purposes of insuring employers against liability under the workers' compensation law, the fund itself was the "owner." *Id*. at 597. The fact that the relevant statute provided that the fund was to be "deemed" a mutual insurer did not change that conclusion. The court did not consider the disposition of the assets, were the insurer to be dissolved by the state legislature. *See also Williams v. Industrial Commission of Ohio*, 156 N.E. 101, 103 (Oh. 1927) (holding that an employee of an insolvent employer could recover from fund created under worker's compensation law and consisting of premium payments of other employers because "the fund becomes property of the state, and is held in trust for the payment of compensation to such injured employees as the State may designate").

By contrast, in *Workers' Compensation Fund v. Utah*, 125 P.3d 852 (Ut. 2005), the Supreme Court of Utah held that the state had no ownership interest in a quasi-public corporation created by the state to provide workers' compensation insurance when, among other things, a state statute explicitly prohibited the use of its funds "for any purpose other than the operation of the fund." *See also Chez v. Industrial Commission of Utah*, 62 P.2d 549, 551 (Ut. 1936) (if Utah fund were discontinued by state, any excess proceeds of liquidation would belong to policyholders, not state); *State Compensation Fund of Arizona v. Peterson*, CV 2003-011970 (Ariz. Super. Ct. 4/13/04) (employer policyholders had vested right in workers' compensation fund when underlying statute provided that assets of fund were to be used "solely" for workers' compensation benefits and administrative expenses; accordingly, a transfer of part of fund to state's general fund was unconstitutional).

*Summary*

In sum, courts in other jurisdictions have recognized a state's right to dispose of funds of a state-sponsored workers' compensation insurer when those funds exceeded the amount necessary to fulfill the insurer's contractual obligations and when the underlying statute did not explicitly disclaim the state's interest in those moneys or dedicate *all* moneys in such a fund *solely* to the payment and administration of claims.

## III

## Conclusion

As explained above, it is our opinion that:

1.    The reserves and surplus that the Insurance Article requires IWIF to maintain with respect to its policies are held in trust for the employers who are IWIF's policyholders and the employees who are entitled to benefits under IWIF's policies.  If the General Assembly chose to terminate IWIF's existence, it would need to make arrangements to preserve such funds for those purposes.

2.    To the extent that IWIF has assets in excess of the reserves and surplus required by the Insurance Article, upon IWIF's termination, those assets would belong to the State, which created IWIF.  The statute governing IWIF provides for the General Assembly to direct the disposition of those assets or for the assets to be distributed "as justice requires."

Douglas F. Gansler
*Attorney General*

Robert N. McDonald
*Chief Counsel*
 *Opinions and Advice*