[921 NE2d 145, 893 NYS2d 453]

In the Matter of Ivey Walton et al., Appellants, v New York State Department of Correctional Services, Respondent, et al., Respondent.

Argued October 13, 2009; decided November 23, 2009

476

## POINTS OF COUNSEL

*Center for Constitutional Rights,* New York City (*Rachel Meeropol* and *Darius Charney* of counsel), and *Community Service Society* (*Juan Cartagena* and *Michelle Light* of counsel), for appellants. I. The Appellate Division erred in dismissing appellants' unlawful tax claim. (*American Ins. Assn. v Lewis,* 50 NY2d 617; *New York Tel. Co. v City of Amsterdam,* 200 AD2d 315; *Matter of Torsoe Bros. Constr. Corp. v Board of Trustees of Inc. Vil. of Monroe,* 49 AD2d 461; *Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor,* 40 NY2d 158; *Suffolk County Bldrs. Assn. v County of Suffolk,* 46 NY2d 613; *Gasparo v City of New York,* 16 F Supp 2d 198; *Collins Holding Corp. v Jasper County, S.C.,* 123 F3d 797; *Matter of General Tel. Co. of Upstate N.Y. v Lundy,* 17 NY2d 373; *Matter of Cahill v Public Serv. Commn.,* 76 NY2d 102; *Lipscomb v Columbus Mun. Separate School Dist.,* 269 F3d 494.) II. The Appellate Division erred in dismissing appellants' taking claim. (*McGuire v Ameritech Servs., Inc.,* 253 F Supp 2d 988; *Alliance of Am. Insurers v Chu,* 77 NY2d 573; *Webb's Fabulous*

*Pharmacies, Inc. v Beckwith,* 449 US 155; *Armstrong v United States,* 364 US 40.) III. The Appellate Division erred in dismissing appellants' equal protection claim. (*Matter of K.L.,* 1 NY3d 362; *Matter of Huckaby v New York State Div. of Tax Appeals, Tax Appeals Trib.,* 4 NY3d 427; *Nordlinger v Hahn,* 505 US 1; *Daleure v Kentucky,* 119 F Supp 2d 683; *Golden v Clark,* 76 NY2d 618; *People v Rodriguez,* 159 Misc 2d 1065; *Sinhogar v Parry,* 53 NY2d 424; *Allegheny Pittsburgh Coal Co. v Commission of Webster Cty.,* 488 US 336; *Corvetti v Town of Lake Pleasant,* 227 AD2d 821; *Matter of Chasalow v Board of Assessors of County of Nassau,* 202 AD2d 499.) IV. The Appellate Division erred in dismissing appellants' freedom of speech and association claim. (*Leon v Martinez,* 84 NY2d 83; *Kleindienst v Mandel,* 408 US 753; *People v Taub,* 37 NY2d 530; *Cox v Louisiana,* 379 US 536; *Cox v New Hampshire,* 312 US 569; *Murdock v Pennsylvania,* 319 US 105; *Matter of Steinbeck v Gerosa,* 4 NY2d 302; *Matter of Children of Bedford v Petromelis,* 77 NY2d 713; *Eastern Conn. Citizens Action Group v Powers,* 723 F2d 1050; *Sentinel Communications Co. v Watts,* 936 F2d 1189.)

*Andrew M. Cuomo, Attorney General,* Albany (*Victor Paladino, Barbara D. Underwood* and *Andrea Oser* of counsel), for respondent. I. The filed rate doctrine bars petitioners' constitutional claims. (*Matter of Syquia v Board of Educ. of Harpursville Cent. School Dist.,* 80 NY2d 531; *Arkansas Louisiana Gas Co. v Hall,* 453 US 571; *Pennsylvania Gen. Ins. Co. v Austin Powder Co.,* 68 NY2d 465; *Parochial Bus Sys. v Board of Educ. of City of N.Y.,* 60 NY2d 539; *City of Cleveland, Ohio v Federal Power Commn.,* 525 F2d 845; *American Telephone & Telegraph Co. v Central Office Telephone, Inc.,* 524 US 214; *Louisville & Nashville R. Co. v Maxwell,* 237 US 94; *Bullard v State of New York,* 307 AD2d 676; *Porr v NYNEX Corp.,* 230 AD2d 564, 91 NY2d 807; *City of New York v Aetna Cas. & Sur. Co.,* 264 AD2d 304.) II. In any event, none of the constitutional claims states a cause of action. (*New York Tel. Co. v Town of N. Hempstead,* 41 NY2d 691; *Matter of Algonquin Gas Transmission Co. v Moore,* 2 Misc 2d 997, 6 AD2d 333; *Henderson v Stalder,* 434 F3d 352; *Lipscomb v Columbus Mun. Separate School Dist.,* 269 F3d 494, *cert denied sub nom. Clark v Lipscomb,* 535 US 988; *American Civ. Liberties Union of Tenn. v Bredesen,* 441 F3d 370; *Yonkers Racing Corp. v State of New York,* 131 AD2d 565; *Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn. of State of N.Y.,* 117 AD2d 156, 135 AD2d 4, 72 NY2d 840; *Arsberry v Illinois,* 244 F3d 558, 534 US 1062; *Video Aid Corp. v Town of Wallkill,* 85 NY2d 663; *City of Rochester v Chiarella,* 58 NY2d 316.)

*Kramer Levin Naftalis & Frankel LLP,* New York City (*Michael J. Sternhell* of counsel), for the Sentencing Project and others, amici curiae. I. The return of prisoners to communities throughout the state is a recognized public policy concern of surpassing magnitude. II. Studies of recidivism uniformly demonstrate that prisoners who maintain close social ties are less likely to engage in crime following release from custody. III. Closer social ties assist former prisoners in managing a range of issues which might otherwise precipitate a return to crime, while also mitigating the effects of incarceration on families and communities. IV. Telephone calls are essential to prisoners' preservation of social ties. (*Overton v Bazzetta,* 539 US 126; *Washington v Reno,* 35 F3d 1093; *Tucker v Randall,* 948 F2d 388.) V. The importance of prison telephone communications has occasioned calls for reform.

*Legal Aid Society,* New York City (*Steven Banks, Scott Rosenberg, John Boston* and *Milton Zelermyer* of counsel), for Legal Aid Society of City of New York, amicus curiae. I. The commission paid by private telephone companies into the state treasury and used by respondents to defray the costs of services in correctional facilities was an unfair and unconstitutional tax on the families, friends and advocates of New York State prisoners. II. Executive action of the governor and the enactment of Correction Law § 623 do not moot review of petitioners' constitutional claims.

*Weil, Gotshal & Manges LLP,* New York City (*Robert F. Carangelo, Douglas Lumish* and *Allen Yu* of counsel), and *Innocence Project, Inc.* (*David Loftis* of counsel), for Innocence Project, Inc. and another, amici curiae. I. The restrictions on prisoner communications imposed by the Department of Correctional Services telephone surcharge violates critical First Amendment rights. (*Turner v Safley,* 482 US 78; *Washington v Reno,* 35 F3d 1093; *Morgan v LaVallee,* 526 F2d 221; *Johnson v Galli,* 596 F Supp 135; *Pell v Procunier,* 417 US 817; *Minneapolis Star & Tribune Co. v Minnesota Comm'r of Revenue,* 460 US 575; *Johnson v Avery,* 393 US 483; *Procunier v Martinez,* 416 US 396; *Thornburgh v Abbott,* 490 US 401; *Nasir v Morgan,* 350 F3d 366.) II. The collect call surcharges constitute an illegal tax that should be invalidated. (*American Ins. Assn. v Lewis,* 50 NY2d 617; *New York Tel. Co. v City of Amsterdam,* 200 AD2d 315; *Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor,* 40 NY2d 158; *Suffolk County Bldrs. Assn. v County of Suffolk,* 46 NY2d 613; *Sonmax, Inc. v City of*

*New York,* 43 NY2d 253; *Castle Oil Corp. v City of New York,* 89 NY2d 334; *Greater Poughkeepsie Lib. Dist. v Town of Pough-keepsie,* 81 NY2d 574; *Matter of Torsoe Bros. Constr. Corp. v Board of Trustees of Inc. Vil. of Monroe,* 49 AD2d 461.)

### OPINION OF THE COURT

GRAFFEO, J.

Between 1996 and 2007, the Department of Correctional Services (DOCS) contracted with MCI Worldcom Communications Inc. (MCI) for the provision of telephone services in state prisons. Under the agreement, MCI charged the recipients of inmate collect calls a certain rate and paid a percentage of the revenues generated on each call to DOCS as a commission. The payment of these commissions was later restricted by statute. But this proceeding was commenced by petitioners—family members and legal services providers of inmates incarcerated in DOCS facilities—before such legislative action. Their verified petition and complaint alleges that the portion of the telephone charge allocated as a DOCS commission constituted an illegal tax or fee, amounted to a government taking without just compensation and violated petitioners' equal protection and free speech and association rights. We agree with the Appellate Division that petitioners' allegations fail to assert cognizable claims under the New York Constitution and we therefore affirm.

As detailed in our prior decision (*see Walton v New York State Dept. of Correctional Servs.,* 8 NY3d 186 [2007] [*Walton I*]), this controversy arises from DOCS' implementation of a telephone calling system that allowed inmates to contact family, friends and legal services providers using coinless pay telephones without operator assistance. To establish the system, DOCS issued requests for proposals to prospective providers in 1996 and again in 2001 detailing the appropriate security features needed in the prison setting, including technology permitting DOCS to monitor and record calls indefinitely, providing DOCS the capability to restrict access to particular telephone numbers and bar certain users from calling specified numbers, limiting the length of calls and preventing inmate calls from being forwarded by call recipients. As a result of the competitive bidding process, MCI won the contract in both 1996 and 2001. In exchange for receiving exclusive access to inmates and their call recipients, MCI agreed to pay DOCS a commission on each call. During the relevant time frame, the payment of commissions in return for

acquiring access to a customer base was common in inmate calling plans in other states as well as in telephone services contracts outside the prison context. DOCS used the commission revenues to fund a variety of different programs supported by its Family Benefit Fund, such as health care services for inmates, bus services for family visitation programs, free inmate postage and expenses at its visitor centers. Only a small portion of the commission represented the actual costs DOCS incurred in administering the inmate calling program.

Because MCI is a telephone services provider, the rates or tariffs it charges customers require approval from the Federal Communications Commission (interstate calls) and the New York Public Service Commission (PSC) (intrastate calls). In 1998, the PSC approved in their entirety the variable rates that DOCS and MCI had agreed to in their 1996 contract, including a 60% per call commission payment.[1] DOCS and MCI subsequently entered into a similar contract in 2001 that continued the prior tariff schedule but reduced the DOCS commission to 57.5%.

In 2003, DOCS concluded that the existing variable rate structure was unfair to most families receiving calls and, as a result, DOCS and MCI amended their contract to provide for a flat rate (a $3 surcharge per call plus $.16 per minute) but continued the DOCS commission at 57.5%. MCI submitted a revised tariff filing with the PSC and a rate review proceeding ensued in which petitioners challenged the total rate as unjust and unreasonable, particularly the portion attributable to the DOCS commission. The PSC approved MCI's rate change in October 2003 but, because DOCS is a government agency and not a telephone services provider, the PSC concluded that it lacked jurisdiction to assess the propriety of the DOCS commission. Thus, it reviewed only the "jurisdictional portion" of the rate—i.e., the 42.5% retained by MCI—and determined that it was just and reasonable. In doing so, the PSC referenced the fact that, outside the prison context, AT&T assessed a $2.25 surcharge plus a flat rate of $.30 per minute for station-to-station collect calls—a rate resulting in substantially greater call costs than the MCI "jurisdictional rate." The PSC therefore directed that MCI file the new rate in a bifurcated form that

---

1. Different but similarly-situated litigants pursued state-court challenges to the 1996 contract but their claims were dismissed (see Bullard v State of New York, 307 AD2d 676 [3d Dept 2003]).

made clear to customers which part of the rate would be retained by MCI and which would be forwarded to DOCS.[2]

In this action, petitioners are two legal services providers who represent prisoners and three individuals who have accepted collect calls from family members incarcerated in DOCS facilities and paid the total rate charged by MCI under the inmate calling plan, including the DOCS commission.[3] They commenced this combined declaratory judgment and CPLR article 78 proceeding against DOCS and MCI within four months of the PSC determination. In the verified petition and complaint, petitioners challenged DOCS' collection of the commission on a variety of legal theories, including four state constitutional rationales.

First, petitioners alleged that, by collecting a commission, DOCS was taxing them to pay for Family Benefit Fund services without legislative authorization to impose such a tax. Second, they characterized the DOCS commission as a governmental taking of property (money) without just compensation. Third, they argued that the inclusion of the commission in the rates charged for telephone services violated their right to the equal protection of the law. Finally, they claimed that the call system impeded their freedom to associate with and speak to their loved ones and clients. Based on these causes of action, petitioners sought an injunction precluding MCI from charging more than the 42.5% "jurisdictional rate" reviewed by the PSC; a declaration that DOCS' actions were illegal; and refunds from DOCS for the commissions that had been collected by MCI and forwarded to DOCS.

Respondents DOCS and MCI moved to dismiss the verified petition and complaint as untimely and asserted that the causes of action failed to state cognizable claims for relief. As a separate ground for dismissal, respondents contended that petitioners' challenge to the rate collected by MCI was barred by the filed rate doctrine, which constituted a total defense even if petitioners' allegations would otherwise be actionable. Supreme Court and the Appellate Division dismissed petitioners'

---

2. Because petitioners did not sue the PSC, the propriety of that agency's decision not to review the total rate to assess whether it was just and reasonable is not before this Court for review.

3. Petitioners have expressed an intent to seek class action certification.

constitutional causes of action as time-barred[4] but, in *Walton I,* this Court reinstated those claims as timely.

While *Walton I* was pending in this Court, Governor Eliot Spitzer announced a change in executive policy and required DOCS to discontinue the practice of collecting commissions on inmate calls. The Legislature also acted, adopting Correction Law § 623 which, effective April 1, 2008, made it unlawful for DOCS to accept or receive revenue in excess of its reasonable operating costs for administering an inmate calling system (*see* L 2007, ch 240). The parties agree that these executive and legislative actions render petitioners' claims for injunctive relief academic and that any decision in this case will affect the rights and liabilities of these parties only to the extent of determining petitioners' entitlement to refunds.

After we decided *Walton I,* this matter was remitted to Supreme Court to address the arguments raised in the motions to dismiss that had not been reached due to the dismissal on the threshold statute of limitations issue. Supreme Court reviewed each of petitioners' state constitutional arguments— the assertion that the DOCS commission constituted an unlawful tax, that it amounted to a governmental taking without just compensation, that it violated petitioners' equal protection and free speech/association rights—but concluded that petitioners failed to state cognizable claims for relief, warranting dismissal of the verified petition and complaint (18 Misc 3d 775 [2007]). The Appellate Division unanimously agreed with Supreme Court's treatment of the constitutional claims and also addressed DOCS' alternative argument that the refund claims would, in any event, be barred by the filed rate doctrine, rejecting that defense (57 AD3d 1180 [2008]). The case proceeded to this Court as of right.[5]

We begin by clarifying what issues are not before us. Petitioners and the amici curiae urge that DOCS' decision to seek a commission on calls made by inmates was, to say the least, ill-advised. They contend that the inclusion of a commission

---

**4.** Petitioners articulated seven causes of action in their complaint. The Appellate Division rejected three of those—the claims for "enforcement" of the PSC determination, an accounting and for relief under General Business Law § 349—on additional grounds unrelated to timeliness and this Court upheld the dismissal of those claims (*Walton I,* 8 NY3d at 194).

**5.** Since only the constitutional claims were reinstated and the relief potentially available was limited to refunds from DOCS, MCI ceased participating in this case and has not filed a brief in this appeal.

inflated the cost of inmate telephone calls to such an extent that it limited the ability of inmates to maintain family and community ties, with significant public safety and policy consequences since it is well-established that recidivism rates are higher for incarcerated individuals who lack those ties. They claim that DOCS—the agency charged with the care and rehabilitation of inmates—should have adopted an inmate calling system that maximized call affordability to encourage greater communication between inmates and the outside world.

With the caveat that, by its nature, incarceration restricts the ability of a prisoner to associate with family and friends, petitioners' public policy arguments are clearly substantial. But the expedience of the contract design by this executive agency is not before us for review; our task is limited to determining whether our State Constitution precluded DOCS from entering into a telephone services arrangement that included a commission. Petitioners and the amici appropriately presented their concerns to the other branches of government and successfully influenced a change in state policy, first by gubernatorial directive and then by statute. Petitioners were therefore able to achieve the primary relief they sought in this litigation—a change in the inmate calling system, resulting in a significant reduction in costs incurred by call recipients.

The issue that remains for us to decide is whether the now-defunct DOCS policy violated the New York Constitution, a determination that is necessary because petitioners continue to seek refunds for the commission portion of the telephone charges they paid while the former plan was in effect. In reviewing a motion to dismiss, "the court will accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Nonnon v City of New York*, 9 NY3d 825, 827 [2007] [internal quotation marks omitted]). Applying this standard, we address each cause of action in turn.

## I. The Illegal Tax or Fee Claim

Petitioners begin with the premise that the DOCS commission is a tax and, since taxes can be levied only by legislative bodies, DOCS' contractual decision to collect a commission was illegal as it violated the Separation of Powers Doctrine embedded in the New York Constitution (*see generally* NY Const, art III, § 1; art XVI, § 1). In the same vein, petitioners assert that,

even if not a tax, the commission charges were unlawful because they amounted to fees imposed by a regulatory body that bore no reasonable relationship to the cost of regulation.

A tax is a charge that a government exacts from a citizen to defray the general costs of government unrelated to any particular benefit received by that citizen (*see generally American Ins. Assn. v Lewis*, 50 NY2d 617, 623 [1980]). Only legislative bodies have the power to impose taxes (*see* NY Const, art III, § 1). Municipalities and administrative agencies engaged in regulatory activity can assess fees that need not be legislatively authorized as long as "the fees charged [are] reasonably necessary to the accomplishment of the regulatory program" (*Suffolk County Bldrs. Assn. v County of Suffolk*, 46 NY2d 613, 619 [1979]). In the regulatory arena, fees must bear at least "a rough correlation to the expense to which the State is put in administering its licensing procedures or to the benefits those who make the payments receive" (*see American Ins. Assn.*, 50 NY2d at 622; *see generally National Cable Television Assn., Inc. v United States*, 415 US 336 [1974]). Typically, fees are paid to obtain access to a government service or benefit, such as the fees paid to obtain licenses to practice professions in particular jurisdictions.

█ Beyond imposing taxes and engaging in regulatory activities that generate fees, governmental entities can and do participate in other economic activities through voluntary contractual arrangements with the private sector. For instance, they buy, sell and lease real property, they purchase furniture, computers and other commodities, they sell surplus goods, they operate hospitals and colleges, and they enter into agreements with consultants, contractors and service providers. Although petitioners contend that the DOCS commission constituted exaction of a tax or fee, we conclude that MCI's contractual obligation fell into this other permissible category of governmental activity.

For security reasons, DOCS chose to implement an inmate calling plan facilitated by the installation of coinless payphones used by inmates to place station-to-station collect calls.[6] Under the plan, the call recipient was advised that the inmate was

---

**6.** The decision to implement a collect-call system was plainly within DOCS' authority. Although, by enacting, the Legislature has foreclosed DOCS from collecting a commission that exceeds the costs incurred for operation of an inmate telephone service, it has clarified that DOCS has the discretion to determine whether to employ "a 'prepaid' or 'collect call' system, or a combination thereof" (Correction Law § 623 [2]).

calling and then was given the option of accepting or declining the call. If the call was declined, no charges were incurred by the call recipient. If the person agreed to accept the call, the recipient was charged the total telephone services rate, which included the commission MCI was obligated to pay DOCS.

In the telephone services industry, a per-call commission is a standard method of compensating the owner of the property where a payphone is located. These commissions have been deemed "business expense paid to compensate for the rental and maintenance of the space occupied by the payphone and for access to the telephone user" (*Matter of AT & T's Private Payphone Commn. Plan*, 3 FCCR 5834, 5836 [1988]). Whether the payphone is positioned in a public airport or a private shopping mall, the owner of the property is entitled to reasonable compensation for allowing the telephone services provider access to its property. And, although other ways of calculating the value of the rent or access charge could certainly be devised, per-call commissions have apparently become the industry standard.

Even though this per-call calculation methodology invites the argument that the commission is an additional rate that the provider will undoubtedly pass along to the consumer, commissions have not been viewed by regulatory bodies as a separate tariff. Rather, they are expenses incurred by the telephone services provider, comparable to other types of operating costs, that are encompassed within the tariff ultimately filed with the regulatory agencies and charged to customers (*see e.g. id.*). Not only were such commissions common in the payphone industry but, during the period relevant to this lawsuit, they were often included in other state inmate calling plans where the commission typically ranged from 20% to 63% (*In re Implementation of Pay Tel. Reclassification & Compensation Provisions of Telecom. Act of 1996*, 17 FCCR 3248, 3253 n 34 [2002]).[7]

---

7. Similar constitutional challenges to the commissions received by prison administrators in connection with other states' inmate calling plans have not succeeded (*see e.g. Arsberry v Illinois*, 244 F3d 558 [7th Cir 2001], *cert denied* 534 US 1062 [2001]; *Johnson v State of Cal.*, 207 F3d 650 [9th Cir 2000]; *Daleure v Commonwealth of Ky.*, 119 F Supp 2d 683 [WD Ky 2000], *appeal dismissed* 269 F3d 540 [6th Cir 2001]). On one or two occasions, trial courts have allowed First Amendment claims to survive a motion to dismiss (*see e.g. McGuire v Ameritech Servs., Inc.*, 253 F Supp 2d 988 [SD Ohio 2003]), but we conclude, as does the dissent, that the free speech and association claim lacks merit.

Under the contract at issue in this case, the obligation to pay DOCS the commission is imposed on MCI—not call recipients. Although MCI intended to collect the total rate from call recipients (including the portion covering the commission), it owed the commission to DOCS regardless of whether it actually received payment from these consumers. Despite MCI's contractual obligation to forward the access charge to DOCS, the per-call commission was not a "tax" imposed on the telephone services provider. Of course, having voluntarily participated in the bidding process and entered into an agreement with DOCS, MCI could not, in any event, complain that government compulsion was involved.[8]

Given that no tax or fee has been imposed on MCI—the company that is actually obligated to pay the commission—we are not persuaded that the commission was transformed into a tax or fee just because MCI passed this cost on to call recipients along with its other reasonable operating expenses. If the State leased public property that it owned to a commercial retail business at a profitable rent, would customers be able to complain that they had been "taxed" when the business tenant passed on its rental costs by charging higher prices for its goods? This Court has never held that the government is precluded under the Constitution from charging market rents for its properties, nor have we suggested that, when it does so, its revenues can be no greater than the amount necessary to cover the actual costs associated with ownership or maintenance. Moreover, it is significant that DOCS had no "enforcement" authority vis-à-vis the call recipient and could not attempt to collect the commission from that consumer if MCI failed to do so, another fact that distinguishes this scenario from a tax (*see e.g.* Tax Law § 1133 [b], [c] [allowing State to recover unpaid sales and use taxes from consumers]). Petitioners were given the choice of accepting or rejecting the calls and were charged only if they decided to receive telephone services from MCI.

---

**8.** The commission has been analogized to the user charges imposed by public airports on rental car companies and shuttle services who seek access to the customer base provided by such facilities. Claims that these constitute an illegal tax or fee have also been rejected (*see e.g. A & E Parking v Detroit Metro. Wayne County Airport Auth.*, 271 Mich App 641, 723 NW2d 223 [2006]; *Enterprise Leasing Co. v Metropolitan Airports Commn.*, 250 F3d 1215 [8th Cir 2001]). The analogy is, however, somewhat inapt since, in those cases, the user charges were not a creature of contract but were unilaterally imposed by the airport authorities.

Certainly, the contractual arrangement relates to DOCS' performance of a governmental function—the administration of the prison system—but it lacks the hallmarks of a tax or fee because DOCS has not compelled petitioners to purchase services from MCI, nor are telephone services a government benefit (*see generally Valdez v State*, 132 NM 667, 673, 54 P3d 71, 77 [2002] [where call recipients voluntarily accepted inmate calls, rate charged for telephone service was not a tax but was "a price at which and for which the public utility service or product is sold"]).[9] There was nothing unusual or unique about the commission authorized under the contract between DOCS and MCI because payphone commissions of this type are common within the telephone services industry. DOCS was under no obligation to negotiate a commission—it could have allowed MCI to retain all the profits generated by the calls and, if it had, no colorable claim could have been made that call recipients were being taxed. Yet, it also was not constitutionally required to provide MCI or any other telephone company free access to its facilities, when landowners typically receive compensation for granting such access.[10] In sum, although questionable for other public policy and penological reasons, DOCS' decision to enter into an agreement with MCI that required the telephone services

---

**9.** While the dissent is correct that an expense associated with government regulation can be transformed into a tax if it substantially exceeds the costs incurred in administering the program or the government benefits received by the applicant, that analysis is inapplicable here since DOCS is not engaged in regulation of the telephone services industry, nor are telephone services a government benefit. In addition, DOCS has not imposed the commission—it was the product of a voluntary contractual arrangement. This case is therefore unlike the precedent relied on by the dissent involving fees imposed by a state or municipal agency engaged in regulatory activity (*see American Ins. Assn.,* *supra* ["capping" fee imposed on insurers as a condition of doing business in New York constituted an unlawful tax where it bore no relationship to cost of administering licensing program or the benefits received by insurers]; *Suffolk County Bldrs. Assn., supra* [inspection fees imposed by health department with respect to issuance of permits were legitimate because there was a reasonable concurrence between the fees and regulatory program expenses]; *Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor*, 40 NY2d 158 [1976] [fees imposed on applicants for zoning variances and special use permits were invalid where village failed to demonstrate any correspondence between fees and regulatory costs]).

**10.** The dissent's list of hypothetical examples of circumstances when the State might abuse its authority (dissenting op at 500-501) misses the mark since there is no analogy in the private sector for any of the hypothetical charges. In contrast, commissions on telephone services are a standard means of calculating rental costs in the payphone services industry—a private-sector business—and, in this case, MCI voluntarily entered into a contractual agreement to pay them to DOCS.

company to pay a commission on telephone calls emanating from coinless payphones on DOCS' properties did not amount to an illegal tax or fee.

Finally, even if the DOCS commission is viewed as a tax as petitioners maintain, their claim for refunds would be barred because they failed to pay the rate under protest (*Video Aid Corp. v Town of Wallkill*, 85 NY2d 663 [1995]). In the context of this case, the protest requirement would have been fulfilled by a letter to MCI and DOCS at the time the bills were paid objecting that the charge was an illegal tax and indicating that payment was being remitted under protest. Petitioners' allegation that such an obligation was excused on a "duress" rationale is not supported by our precedent (*City of Rochester v Chiarella*, 58 NY2d 316, 323 [1983] ["duress . . . is present . . . where payment of a tax is necessary to avoid threatened interference with present liberty of person or immediate possession of property"]).

## II. The "Taking" Cause of Action

Article I, § 7 (a) of the State Constitution provides that "[p]rivate property shall not be taken for public use without just compensation." Invoking this provision, petitioners claim that DOCS' collection of a commission is a "taking" without just compensation. Petitioners do not assert that the State has created a property interest in low-cost telephone services for inmate call recipients or anyone else. Rather, the property at issue here is the money petitioners paid for the services provided by MCI.

Petitioners' takings argument suffers from the same disability as their illegal taxation contention—a "taking" cannot occur in the absence of government compulsion. Typically, takings claims involve the appropriation or occupation of property without the owner's consent or, in the case of a regulatory taking, the enactment of legislation or an ordinance that is alleged to have destroyed the commercial value of a particular property (*see e.g. Matter of Smith v Town of Mendon*, 4 NY3d 1 [2004]; *Alliance of Am. Insurers v Chu*, 77 NY2d 573 [1991]). Here, petitioners were not compelled to pay anything either to DOCS or MCI, nor was their money or other property confiscated by the State (*cf. Alliance of Am. Insurers, supra* [where State guaranteed that insurers would receive income generated by insurer insolvency fund to which they were required to contribute, legislation raiding the fund amounted

to an unconstitutional taking]). The acceptance of collect calls was voluntary action and, by taking the calls, petitioners agreed to pay the associated rate. They were in control of the length of the calls and, thus, the costs incurred. Just like any other consumer, petitioners purchased a service from MCI and were billed accordingly.

Nor was there any appropriation of private property without "just compensation" because, in exchange for their payments, petitioners received telephone services. Notably, although they assert that DOCS should have arranged for more affordable rates, petitioners do not allege that the rate charged by MCI was exorbitant from a market perspective. As the PSC determination indicated, during the same time frame and with the approval of the PSC, another telephone services provider was charging comparable if not higher rates for station-to-station collect calls in New York outside the inmate calling context. Essentially, petitioners' takings claim boils down to the contention that DOCS had a constitutional obligation to ensure that the family members and legal services providers of inmates received telephone services at the lowest possible expense. While this might be a desirable policy decision, it was not an obligation mandated by the New York Constitution.

### III. The Free Speech and Association Claim

Article I, § 8 of the New York Constitution provides: "Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." Relying on this provision, petitioners contend that the increased cost of inmate calls resulting from the DOCS commission impaired their constitutionally protected right to speak to and associate with their incarcerated loved ones or clients.

In reviewing the propriety of limitations impacting the free speech and association rights of prisoners, we have employed the same analysis as the United States Supreme Court (*see Matter of Lucas v Scully*, 71 NY2d 399 [1988]). The Supreme Court has made clear that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution . . . , nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside' " (*Thornburgh v Abbott*, 490 US 401, 407 [1989] [some internal quotation marks and citations omitted]). But that

being said, challenges to limitations on inmate communication must account for the reality that "[t]he very object of imprisonment is confinement . . . An inmate does not retain rights inconsistent with proper incarceration . . . [a]nd . . . freedom of association is among the rights least compatible with incarceration . . . Some curtailment of that freedom must be expected in the prison context" (*Overton v Bazzetta*, 539 US 126, 131 [2003] [citations omitted]). For this reason, whether a claim is brought by a prisoner, a family member or someone else who wishes to communicate with a prisoner, the claim must be assessed using the same test applied to constitutional restrictions on inmate rights—the *Turner v Safley* standard (482 US 78 [1987]; *see Overton, supra*; *Thornburgh, supra*). Under *Turner*, when a policy or regulation impinges on a prisoner's constitutional rights, the action "is valid if it is reasonably related to legitimate penological interests" (*Turner*, 482 US at 89; *Lucas*, 71 NY2d at 405-406).

Thus, to state a viable claim under the Free Speech and Association Clause in this context, petitioners must allege that the DOCS commission was so high that it substantially impaired the limited right of inmates to contact and associate with family members or legal services providers and that the commission bore no reasonable relationship to legitimate penological aims. Even assuming their allegations to be true, petitioners do not meet this threshold.

While inmates unquestionably have a constitutional right to communicate with the outside world in a manner and to an extent consistent with their incarcerative status, petitioners point to no persuasive authority for the proposition that this equates to a right to use a specific means for such communication—the telephone—much less to guarantee telephone services at a particular cost. Virtually every court to have addressed this issue has held that there is no constitutionally guaranteed right of inmates to use a telephone (*see e.g. United States v Footman*, 215 F3d 145, 155 [1st Cir 2000]; *Arsberry v Illinois, supra*, 244 F3d 558 [2001] [rejecting First Amendment challenge to Illinois inmate calling plan]). Only one appellate court has indicated in dicta that such a right might exist but it rejected a challenge similar to the one pursued in this case, noting that an inmate has no right to low-cost telephone access and that a rate-based challenge to an inmate calling system would be cognizable only where "the rate charged is so exorbitant as to deprive prisoners of phone access altogether" (*see Johnson v State of Cal., supra*,

207 F3d 650, 656 [2000]; *but see Valdez v Rosenbaum*, 302 F3d 1039, 1048 [9th Cir 2002], *cert denied* 538 US 1047 [2003] [characterizing statement in *Johnson* as dictum and indicating that First Amendment protects right to communicate, not right to use telephone as a means of communication]; *see also Byrd v Goord*, 2005 WL 2086321, 2005 US Dist LEXIS 18544 [SD NY 2005], *mot for class certification denied as moot* 2007 WL 2789505, 2007 US Dist LEXIS 71279 [SD NY 2007]).

Given that alternate means of communication remain available to New York inmates and their families (including mail and visitation), with mail offered at low or no cost (in fact, revenues from the DOCS commission were used to fund a free postage program), the additional expense associated with the DOCS commission on telephone calls did not imperil the right of inmates to communicate with others. Indeed, petitioners in this case indicate that they continued to accept collect calls from their loved ones despite the rate charged by MCI, albeit less frequently. Although we do not doubt that petitioners would have engaged in more of the real-time, verbal communication afforded by telephone technology if prices had been lower (and the value of such personal communication was certainly a motivation for the eventual legislation addressing this practice), the hardship they allege is not a constitutionally significant curtailment of the free speech and association guarantee, particularly given the limited nature of that right in prison settings.

## IV. The Equal Protection Claim

The New York Equal Protection Clause (NY Const, art I, § 11), modeled after its federal counterpart (*see Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985]; *Dorsey v Stuyvesant Town Corp.*, 299 NY 512, 530 [1949], *cert denied* 339 US 981 [1950]), commands that "persons similarly situated should be treated alike" (*Cleburne v Cleburne Living Center, Inc.*, 473 US 432, 439 [1985]; *see Bower Assoc. v Town of Pleasant Val.*, 2 NY3d 617, 631 [2004]). Unless a suspect class or fundamental right is involved, which is not the case here, classifications that create distinctions between similarly-situated individuals will be upheld if they are rationally related to a legitimate government interest (*Port Jefferson Health Care Facility v Wing*, 94 NY2d 284, 289 [1999], *cert denied* 530 US 1276 [2000]; *Golden v Clark*, 76 NY2d 618 [1990]).

Here, petitioners allege that their equal protection rights have been violated because they have been forced to pay DOCS commissions, which were used by DOCS to fund the New York prison system, even though they are situated no differently from other New York residents. Of course, what differentiates petitioners from the class they identify is that petitioners accepted collect calls from inmates and therefore purchased telephone services from MCI, triggering MCI's obligation to pay DOCS a commission. The other New Yorkers they reference were not charged because they did not receive these telephone services.

██ In fact, there is no category of individuals situated similarly to petitioners that may be used as a basis of comparison. This is not a case where prison administrators have devised multiple calling programs, offering inmates in one facility rates more favorable than another. All recipients of inmate calls were treated the same way under the DOCS/MCI contract. Even comparing petitioners to the class they most closely resemble—recipients of station-to-station collect calls from non-inmates—they fail to state a cognizable equal protection claim.[11] DOCS does not provide telephone services and plays no role in determining the prices paid by recipients of station-to-station collect calls from non-inmates. Thus, even assuming that this class of non-inmate calls is comparable to inmate calls, DOCS has not engaged in action that treats two similarly-situated classes of individuals differently.

Furthermore, petitioners have not alleged that recipients of station-to-station collect calls from non-inmates pay less than the rate they paid MCI. At best, the record suggests the costs were roughly equivalent because, when reviewing MCI's rate, the PSC noted that AT&T imposed a surcharge of $2.25 per call plus $.30 per minute—a rate comparable to the inmate calling plan ($3 surcharge plus $.16 per minute). Indeed, a 10-minute non-inmate collect call on AT&T's service would cost $5.25— $.65 more than MCI charged for the same call from an inmate. Petitioners point out that, beyond the prison environment,

---

11. This comparison is, however, also imperfect because, for reasons unrelated to the commission, it is to be expected that inmate calls will be more costly than non-inmate calls due to the many security features that must be implemented—features petitioners have not challenged in this lawsuit. And because prisoners initiate the calls, their family members are constrained by those security measures. Petitioners do not dispute that the bundle of security capabilities in the MCI plan need not, and generally is not, provided in regular calling plans involving non-inmates.

individuals can avoid the use of payphones by purchasing calling cards, cell phones or other private telephone services—choices unavailable to inmates. While this is true, it does not further petitioners' constitutional argument because the limitation on the options available to inmates emanates from the security concerns attending their incarcerative status—it is not a function of the DOCS commission. In sum, even assuming petitioners' allegations to be true, because DOCS has not treated two classes of similarly-situated individuals differently, petitioners' equal protection claim was properly dismissed.

In closing, we stress that our holding that petitioners' constitutional challenges to the inclusion of a commission in the DOCS contract for inmate telephone services were lacking in merit should not be misinterpreted as an endorsement of the former DOCS policy. The Executive and the Legislature, the two branches of government responsible for evaluating the penological value of the system's design and the accompanying economic impact on call recipients, have determined that commission charges in excess of actual expenses incurred by DOCS are not a proper cost to be passed on to the families and legal representatives of inmates. We do not doubt the wisdom of that public policy determination.

Having concluded that each of the constitutional claims was properly dismissed, we have no occasion to address DOCS' alternative ground for affirmance—that petitioners' request for refunds was barred by the filed rate doctrine defense.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

READ, J. (concurring). I would affirm the Appellate Division's order on the ground that petitioners' claims are barred by the filed rate doctrine. Thus, I do not reach the constitutional issues that engage the majority.

"The considerations underlying the [filed rate] doctrine . . . are preservation of the [ratesetting] agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant" (*Arkansas Louisiana Gas Co. v Hall*, 453 US 571, 577-578 [1981], quoting *City of Cleveland, Ohio v Federal Power Commn.*, 525 F2d 845, 854 [DC Cir 1976] [internal quotation marks omitted]). The doctrine thus "forbids a regulated entity to charge rates [to customers] for its services other than those properly filed

with the appropriate . . . regulatory authority" (*id.* at 577). A customer may sue the agency to obtain judicial review of a rate, but may not collaterally attack the rate in any other type of lawsuit to invalidate or modify it, or seek damages based on the difference between the filed rate and some other rate thought by the customer to be more reasonable (*see Wegoland Ltd. v NYNEX Corp.*, 27 F3d 17, 19 [2d Cir 1994]). This rule is "undeniably strict and . . . may work hardship in some cases," but is necessary to further the legislative goal of preventing unreasonable and discriminatory charges (*American Telephone & Telegraph Co. v Central Office Telephone, Inc.*, 524 US 214, 222 [1998], quoting *Louisville & Nashville R. Co. v Maxwell*, 237 US 94, 97 [1915] [internal quotation marks omitted]).

On October 30, 2003, the Public Service Commission (PSC) approved a modified rate structure permitting MCI Worldcom Communications, Inc. (MCI) to charge specified rates for inmate collect calls. As a result, petitioners paid the only rate that MCI was legally authorized to charge for these calls (*see* Public Service Law § 92 [2] [d] [utilities may collect only charges that are filed with the PSC and in effect]). On the importance of the PSC's action, the Appellate Division's decision in *Bullard v State of New York* (307 AD2d 676 [3d Dept 2003]) is instructive. There, the court affirmed the trial judge's dismissal of a claim for damages—which arose from the New York State Department of Correctional Services' (DOCS) 1996 contract with MCI (the predecessor to the contract involved in this lawsuit)— because the statute of limitations had lapsed, and "[a]dditionally . . . the alleged injury . . . arose directly from [claimants'] payment of the filed rate approved by the PSC" (*id.* at 678; *see also Porr v NYNEX Corp.*, 230 AD2d 564, 568 [2d Dept 1997], *lv denied* 91 NY2d 807 [1998] ["It has repeatedly been held that a consumer's claim, however disguised, seeking relief for an injury allegedly caused by the payment of a rate on file with a regulatory commission, is viewed as an attack upon the rate approved by the regulatory commission. All such claims are barred by the 'filed rate doctrine' "]).

Here, the PSC declined to review and approve the portion of the inmate collect call rate attributable to DOCS's commission when it ruled on MCI's proposed modified rate structure. This fact does not cut the ground from under the filed rate doctrine in this case, though, because the PSC nonetheless directed MCI to file the *total* rate—including the commission—which thereby became binding law and "the only lawful charge" that MCI

could impose for inmate collect calls (*American Telephone & Telegraph Co. v Central Office Telephone, Inc.*, 524 US at 222 [internal quotation marks omitted]). As the majority observed in *Walton v New York State Dept. of Correctional Servs.* (8 NY3d 186, 196 [2007] [*Walton I*]), "[w]hile the PSC concluded that it did not have jurisdiction over DOCS, it could have [rejected] MCI's call rate and surcharge *as a whole*" (emphasis added).[1] It was for this reason alone that the *Walton I* court found petitioners' lawsuit to be timely, reckoning that their claims accrued on October 30, 2003 because up until the point of the PSC's order their alleged injuries might have been ameliorated (*id.* at 197). Thus, as in other filed rate cases, petitioners' ostensible damages arise from a rate duly filed with and authorized by the ratesetting agency.

Further, the PSC, in fact, established the reasonableness of the total rate despite its disclaimer with respect to DOCS's commission. In reviewing and approving just that portion of the rate to be retained by MCI, the PSC considered the rates charged by AT&T for *non*-inmate station-to-station collect calls. The evidence showed that the total cost of a 10-minute inmate collect call (including the commission) was $4.60 ($3 surcharge plus 16 cents per minute), which was significantly *less* than the $5.25 that AT&T charged for a 10-minute station-to-station collect call outside the prison context ($2.25 surcharge plus 30 cents per minute). As one of the amici points out, there are good reasons to encourage inmates to maintain their ties to family and the community, and an economical inmate call rate makes this easier. But an inmate call rate is not unreasonable just because it is not as low as it might be.

The dissent appears troubled by the notion that the filed rate doctrine might mandate dismissal of what remains of this lawsuit—a claim for refunds of the commissions (the allegedly excessive portion of the rate) from October 30, 2003 onward. I am hardly the first judge to understand the filed rate doctrine to preclude claims against state-operated prisons or telephone companies arising from the rates charged for inmate collect

---

1. The dissent suggests that the PSC did not act within its "jurisdiction" as required by the filed rate doctrine because it did not have the "power to decide" whether DOCS's commission was reasonable or lawful (dissenting op at 498). But whether or not the PSC possessed this particular "power to decide" makes no difference: the PSC clearly acted within its jurisdiction to approve telephone tariffs—which is to say it acted within its jurisdiction for purposes of the filed rate doctrine—when it ordered MCI to file the total rate.

calls (*see e.g. Valdez v State*, 132 NM 667, 671, 54 P3d 71, 75 [Sup Ct 2002] [filed rate doctrine barred claims for damages, restitution, or imposition of constructive trust on account of commissions on inmate collect calls where regulatory agency had "exempted inmate telephone services from several of its regulations and (had) authorized the rates at issue"]; *see also* Severin, *Is There a Winning Argument Against Excessive Rates for Collect Calls from Prisoners?*, 25 Cardozo L Rev 1469, 1483-1490 [2004] [discussing cases where filed rate doctrine prevented litigants from successfully challenging prison phone rates that include commissions]).

And to be clear, I am not somehow taking the position that "a rate . . . placed in a regulatory agency's file [is] unchallengeable, whether the agency has authority to regulate that rate or not" (dissenting op at 498). I am simply saying that petitioners were required to raise their constitutional and any other objections to the inmate collect call rate in a CPLR article 78 proceeding brought against the PSC to challenge its October 30, 2003 order. If successful, they would have been entitled to prospective relief only (*see Matter of Burke v New York State Pub. Serv. Commn.*, 47 AD2d 91, 95-96 [3d Dept 1975], *affd* 39 NY2d 766 [1976]; *Matter of Long Is. Light. Co. v Public Serv. Commn. of State of N.Y.*, 80 AD2d 977, 978 [3d Dept 1981], *lv denied* 54 NY2d 601 [1981]).[2] Once petitioners chose not to contest the PSC's October 30, 2003 order, the filed rate doctrine kicked in to bar them from launching this collateral attack on the rate.

SMITH, J. (dissenting). In *Arsberry v Illinois* (244 F3d 558, 566 [7th Cir 2001]), a case much like the present one, Judge Posner explained what the state was doing: "[T]he State . . . exercising as it does an iron control over access to the inmate

---

2. Petitioners participated extensively in the administrative proceedings before the PSC, which culminated in the October 30, 2003 order (*see In re MCI WorldCom Communications*, case 03-C-1058, 2003 WL 22495521, 2003 NY PUC LEXIS 616 [Oct. 30, 2003]). They raised the same constitutional objections to MCI's proposed revised tariff as they press in this lawsuit against DOCS (2003 WL 22495521, at *4-5, 2003 NY PUC LEXIS 616, at *12-15; *cf. Feigley v Pennsylvania Pub. Util. Commn.*, 794 A2d 428 [Pa Commw Ct 2002] [affirming Public Utility Commission's disposition of administrative complaint brought by inmate's wife and a citizen's group alleging that inmate collect call rates violated federal constitutional free speech rights and equal protection guarantee]). The PSC declined to address petitioners' constitutional objections, but this only gave them an additional argument on appeal; it did not somehow supply a ground for petitioners to contest the rate in a lawsuit against DOCS rather than the PSC.

market, has rented pieces of the market to different phone companies . . . ." Judge Posner explained that the state was in substance "charging fees or taxes that exploit the monopoly of force that is the definition of government" (*id.*). But he, like today's majority, thought there was no constitutional problem in the government's making money by renting out its police power. I think there are very serious problems. Before discussing them, however, I will address the idea advanced by the concurrence that it does not matter whether the State has acted constitutionally or not, because the "filed rate" doctrine bars any review of the question.

I

The Public Service Commission (PSC) held that it had no power to decide whether DOCS acted reasonably or unreasonably, lawfully or unlawfully, in demanding that MCI pay to the State an extortionate commission on inmates' telephone calls. The portion of MCI's rates that resulted from the State's commission was labeled by the PSC as "non-jurisdictional." This ruling seems right to me; why should the constitutionality of the State's practice be a matter for the PSC to decide? And if the PSC was right to disclaim jurisdiction, it seems obvious that the filed rate doctrine has no application here.

That doctrine states that a regulated entity may not "charge rates for its services other than those properly filed with the appropriate . . . regulatory authority" (*Arkansas Louisiana Gas Co. v Hall*, 453 US 571, 577 [1981]). And of course, in *Arkansas Louisiana Gas Co.*, as in every other case applying the filed rate doctrine that I am aware of, the "appropriate" regulatory authority was one that had jurisdiction over the rate. If that were not so—if the word "filed" were taken literally, so that a rate that is placed in a regulatory agency's file were unchallengeable, whether the agency has authority to regulate that rate or not—the result would be intolerable. The filed rate doctrine would give state officials an all-purpose shield against any independent scrutiny of their behavior. A state could nullify anyone's constitutional right, simply by demanding a commission from the telephone company on calls made by the person the state wanted to victimize—and the resulting telephone rate would be immune from challenge if it was on file with a regulatory agency that had no jurisdiction to alter or reject it.

Surprisingly, my concurring colleague never says whether she thinks the PSC's disclaimer of jurisdiction in this case was right

or wrong. But I infer that she thinks it was wrong—that the PSC did have jurisdiction to consider petitioner's constitutional arguments—partly because, as I have explained, I think it obvious that if the PSC was right, the filed rate doctrine cannot apply. Indeed, the concurrence says that "petitioners were required to raise their constitutional . . . objections to the inmate collect call rate in a CPLR article 78 proceeding brought against the PSC" (concurring op at 497)—a strange thing to do if the PSC acted properly in ignoring those constitutional objections.

If I have correctly understood the concurrence's position, I disagree with it because, as I have said, the constitutional issues seem inappropriate for PSC consideration. *Walton I* provides no support for the contrary view, despite our remark, to which the concurrence refers (concurring op at 496), that the PSC "could have determined that MCI's call rate and surcharge as a whole" were unlawful (*Walton v New York State Dept. of Correctional Servs.*, 8 NY3d 186, 196 [2007]). What we meant, as we explained in the next sentence, was that "[i]t was reasonable for petitioners to believe that the PSC could have rejected MCI's rate and surcharges in their entirety" (*id.*). We did not imply that the PSC erred by refusing to examine the entire rate and surcharge. It did not err; it properly found the portion of the rate attributable to the State's commission to be beyond its jurisdiction; and the filed rate doctrine is inapplicable to this case.

## II

It is plain from the complaint that the State charged petitioners—indirectly, through MCI—sums far in excess of what it cost the State to provide the service from which petitioners benefitted. The complaint says that the costs of maintaining and operating the prison telephone system were less than 8% of the money the State received from it. A document in the record suggests that the disproportion was even greater—that costs were less than 2% of revenues. It is also plain that the State was able to make this huge profit because it had imprisoned the people that petitioners wanted to talk to—that the State was, as Judge Posner put it, exploiting its monopoly of the "inmate market." I think these allegations are sufficient to sustain petitioners' claims of unconstitutional taxation, unlawful taking, and denial of equal protection. (I agree with the majority that petitioners' free speech and association claims are legally insufficient.)

Usurpation of the Power to Tax

It is undisputed that if the payments at issue in this case are properly characterized as taxes, the State has violated the Constitution. Taxation is the province of the Legislature (*see* NY Const, art III, § 1; art XVI, § 1) and DOCS makes no claim that it may levy taxes without legislative authorization.

Taxation is, of course, the normal means by which states raise revenue, but two others have been recognized, which may be labeled as "user fees" (e.g., the State can charge for licenses to defray the cost of a regulatory program) and "market transactions" (e.g., the State can rent its unused office space, or sell its surplus property, for whatever it can get). (Perhaps there are still other valid ways of raising revenue, but no one has claimed that they are applicable in this case.) The payments in issue here cannot be defended as user fees, because the power to charge such fees is limited by the rule "that the fees charged be reasonably necessary to the accomplishment of the regulatory program" (*Suffolk County Bldrs. Assn. v County of Suffolk*, 46 NY2d 613, 619 [1979]; *see also Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor*, 40 NY2d 158, 162-163 [1976]).

Thus, DOCS either unconstitutionally exercised the taxing power or it engaged in legitimate market transactions. I conclude that it did the former.

The majority holds that DOCS was engaging in market transactions, drawing an analogy to a per-call commission that might be charged by an owner of real property for use of a pay telephone "in a public airport or a private shopping mall" (majority op at 486). The majority overlooks an obvious distinction: the people who use the phones at airports and shopping malls are not prevented from leaving the premises by armed guards. The owner of the shopping mall is ordinarily a private entity; the owner of the airport may be a public one, but in allowing use of its premises for a pay telephone it is acting essentially as a private market participant. It is not exploiting, to quote Judge Posner once more, "the monopoly of force that is the definition of government" (*Arsberry*, 244 F3d at 566).

Here, the State has used its imprisonment of inmates as a source of economic leverage. I cannot accept this as legitimate market activity. If the State can do this, why could it not charge for in-person visits to prison inmates—at a rate 50 times the cost of making such visits possible? Why could it not charge

commissions—limited not by the State's costs, but only by what the traffic would bear—on sums earned by inmates in work release programs? Why could it not charge prisoners who seek furloughs an amount limited only by the prisoners' willingness to pay? I cannot believe that the majority would characterize any of these transactions as normal attempts by a government agency to turn a profit in a marketplace, but the majority offers no adequate explanation of why the transactions in this case are different.

A tax is "a compulsory contribution for the purpose of defraying the cost of government" (*American Ins. Assn. v Lewis*, 50 NY2d 617, 623 [1980]). Our cases establish that a contribution may be "compulsory" without being literally compelled on pain of fine or imprisonment: thus, the fees imposed on insurers in *American Insurance Association* were taxes, even though the insurance companies were not literally compelled to transact business in the State; the fees in *Jewish Reconstructionist Synagogue* were taxes, though the synagogue was not compelled to apply for zoning permits and variances; and the fees in *Suffolk County Builders* would (if not legitimate user fees) have been taxes, though the builders were not compelled to seek licenses and approvals, or even to put up buildings. The question is whether the State has applied an unacceptable degree of coercion in exacting the payments. As Justice Holmes explained in *Federal Land Bank of New Orleans v Crosland* (261 US 374, 378 [1923])—a case holding that fees charged for the recording of deeds were an unlawful tax, to the extent they exceeded the state's expenses of maintaining its registry: "The State . . . cannot use its control as a means to impose a liability that it cannot impose directly."

I would hold that where, as in this case, the State has leveraged its police power for a profit, enough coercion is present to make the transaction involuntary—a tax, not an innocent marketplace exchange.

Unconstitutional Taking

The issue of coercion is likewise critical to the takings claim. The majority oversimplifies in saying that "a 'taking' cannot occur in the absence of government compulsion" (majority op at 489)—indeed, if it means "compulsion" literally, it misstates the law. The United States Supreme Court has held that surrenders of property rights not literally compelled by the government are nevertheless "takings" if they are exacted in exchange for

benefits that do not have a nexus to, or are not roughly proportional to, the property rights taken—even though the benefits were ones the state was free to withhold entirely (*Dolan v City of Tigard*, 512 US 374 [1994]; *Nollan v California Coastal Comm'n*, 483 US 825 [1987]). Particularly relevant here is *Dolan*, requiring "rough proportionality" between the exaction demanded by the state and the impact on the state of the private activity that furnished the occasion for the demand (*Dolan*, 512 US at 391). I have explained elsewhere why I think the "exactions" analysis of *Nollan* and *Dolan* is not limited to the real property context in which those cases arose (*Consumers Union of U.S., Inc. v State of New York*, 5 NY3d 327, 379-380 [2005, R.S. Smith, J., dissenting]). I do not see how the State's conduct here, as alleged in the complaint, can withstand an exactions analysis, and I would therefore uphold petitioners' takings claim.

Equal Protection

If I were to view the payments made by petitioners here as no more than voluntary payments for telephone service, I would agree with the majority that petitioners have not been deprived of equal protection. It is true that petitioners are not similarly situated to any other group of telephone users. But the merit of petitioners' equal protection claim becomes apparent when the State's conduct is viewed as a tax, an exaction of money to defray the expenses of government.

The equal protection argument would be essentially the same if the Legislature, seeking to raise funds to operate the prison system, had enacted a tax payable by those people who happened to receive telephone calls from prisoners. I would not think there was an equal protection violation if the State levied such a tax (or user fee) on the prisoners themselves. It is not arbitrary or unfair to require those who have made an expenditure necessary to pay the cost of it. But a tax on everyone who chooses to talk to an inmate on the telephone *is* arbitrary. There is no rational basis for choosing those people, rather than either the inmates or the State's citizens in general, to keep the prison system solvent. The majority concludes otherwise only by overlooking the fact that the State's practice was, essentially, a coercive fiscal measure.

Accordingly, I would reinstate petitioners' unlawful tax, unlawful taking and equal protection claims.

Chief Judge LIPPMAN and Judges CIPARICK, PIGOTT and JONES concur with Judge GRAFFEO; Judge READ concurs in result in a separate opinion; Judge SMITH dissents in another opinion.

Order affirmed, without costs.